# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1787

_____

| | |
|---|---|
| Glenda S. Scoville, | * |
| | * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the Western |
| | * District of Missouri. |
| United States of America, | * |
| | * |
| Appellee. | * |

_____

Submitted: January 12, 2001

Filed: May 29, 2001

_____

Before BEAM and MORRIS SHEPPARD ARNOLD, Circuit Judges, and DOTY,[1]
District Judge.

_____

BEAM, Circuit Judge.

Glenda Scoville appeals a district court[2] judgment sustaining, in part, a tax levy
on insurance proceeds payable to her under a fire insurance policy. We affirm.

_____

[1]The Honorable David S. Doty, United States District Judge for the District of
Minnesota, sitting by designation.

[2]The Honorable Howard F. Sachs, United States District Judge for the Western
District of Missouri.

In May of 1975, Scoville married a dentistry student named Joseph May, and supported him until his graduation. In 1979, May opened a dental practice in Jefferson City, Missouri. He prevailed upon Scoville to work for his practice without salary, which she did for five years. May subsequently opened another practice in Kansas City, Missouri. In 1979, May also became a self-styled "tax protestor," and failed to file tax returns from 1979 to 1993.

In 1983, the couple purchased a farm in Cleveland, Missouri. May's distrust of banks and paper money led him to collect $40,000 worth of nickels, dimes and quarters. The couple used this amount to make a down payment on the property. Neither May nor Scoville could recall to which of them this money belonged. May suggested it was Scoville's as she had worked for him for five years without salary. However, when asked how he had convinced her to accept such a working arrangement, he testified, "I'm a sly devil." Scoville on the other hand could not identify what portion of the $40,000 belonged to her. The farm was titled in Scoville's name, and she signed a $60,000 promissory note and a securing deed of trust for the balance of the purchase price.

May and Scoville divorced in December of 1983. In the divorce settlement, Scoville took ownership of the farm, valued at $100,000, along with May's dental equipment including his chairs, x-ray machines and office furnishings. May received a car and some accumulated gold and silver. Scoville subsequently leased May's dental equipment back to him. At trial, Scoville was unable to identify any property retained by May. After the divorce, Scoville received child support payments and began drawing a salary of $14,000 per year, which the district court found was unrelated to hours worked.

May and Scoville had two children while they were married and three more after the divorce. After the divorce, May continued to live at the farm when working in Kansas City. He continued to maintain personal property at the farm, including

chickens for cockfighting, gold and silver reserves and dental equipment. On at least two occasions, he offered to sell the farm to third parties. May kept some additional property, registered in the name of the Basic Bible Church, at the farm, and also maintained a bank account under that name. He periodically provided Scoville with money for house payments.

In his dental practice, May also employed Helen Chalender and Traci Stroud, a mother and daughter. Chalender testified May told her that he used a $10,000 money order to pay off the outstanding mortgage on the farm and that he divorced Scoville in order to use her as a tax shelter. Stroud testified May paid her in cash, and recounted visiting various banks with him where he would cash checks from patients. He would endorse them with a highlighter, on the theory that the marker would not show up on a microfiche. May told her he did so in order to hide money from the IRS, and also told her he divorced Scoville in order to put assets in her name, where the IRS could not reach them.

May and Scoville remarried in August 1992, because of an IRS investigation into May's failure to file tax returns. In November of that year, May was indicted on various tax-related charges. That same month, Scoville left for Costa Rica, taking along her youngest son, where her four other children soon joined her. At trial, Scoville testified that she left the continental United States partly in order to avoid having to testify against May.

While Scoville was in Costa Rica, May continued to live at the farm. In April, 1993, the farm was completely destroyed by fire. On April 15, May contacted State Farm insurance adjuster Jan Wagoner Combs to initiate the claims process under a policy which named Scoville as the insured. After Scoville learned of the loss she also contacted Combs. Rather than leave directions for contacting her in Costa Rica, which she suggested would be difficult, Scoville directed Combs to leave messages with May. May also directed Combs to deal with him. All correspondence between Combs and

Scoville went through May's Jefferson City office. Combs referred to May as "Mr. I," meaning "Mr. Insured." May filled out and returned personal property inventory forms to State Farm. Needing more information, State Farm forwarded the forms to Scoville, who completed and signed them. May could not sign them as he had been incarcerated. State Farm subsequently issued two checks, one for $92,086 to cover damage to the farm improvements, and one for $60,688 for lost personal property. The IRS levied both checks to address a $179,185 jeopardy tax assessment against May.

Scoville filed a wrongful levy action against the United States under 26 U.S.C. § 7426, alleging May had no interest in the insurance proceeds. The district court found first that May retained an interest in the insurance proceeds because Scoville held the farm as his nominee, and second that as a member of Scoville's household, May was an insured by definition under the policy. The district court awarded Scoville $46,648 in insurance payments for personal property she proved was hers alone, but sustained the government's levy as to the remainder of the payments for personal property and the payments for the destruction of the farm improvements. Scoville appeals.

The failure to pay federal taxes results in a lien on "all property and rights to property, whether real or personal, belonging to" the delinquent taxpayer. 26 U.S.C. § 6321. The IRS may levy upon all property to which this lien attaches. 26 U.S.C. § 6331(a). This levy power extends to property held in the name of persons or entities other than the delinquent taxpayer, to the extent that the taxpayer has an interest in such property. See G.M. Leasing Corp. v. United States, 429 U.S. 338, 350 (1977). To levy upon property held by a third party in which the delinquent taxpayer has an interest, the government must give notice to that party. Id.

Because such a levy will necessarily implicate the property rights of individuals other than the delinquent taxpayer, any person other than the delinquent taxpayer who claims an interest in the levied property may file an action against the United States

-4-

under 26 U.S.C. § 7426(a)(1). To prevail, a plaintiff must demonstrate "an interest . . . superior to the United States' interest in the property, and that the levy was wrongful." Bremen Bank & Trust Co. v. United States, 131 F.3d 1259, 1262 (8th Cir. 1997). The parties do not dispute that Scoville has an interest in the insurance proceeds so we focus only on the second element.

A levy is wrongful when made on property in which the delinquent taxpayer actually has no interest. Pate v. United States, 949 F.2d 1059, 1060 (10th Cir. 1991). The government bears the initial burden of persuasion as to the taxpayer's interest in the seized property. Security Counselors, Inc. v. United States, 860 F.2d 867, 869 (8th Cir. 1988).[3] Other circuits have required the government to prove a "nexus" between the levied property and the taxpayer, see, e.g., Oxford Capital Corp. v. United States, 211 F.3d 280, 287 (5th Cir. 2000); LiButti v. United States, 107 F.3d 110, 118 (2d Cir. 1997); Morris v. IRS, 813 F.2d 343, 345 (11th Cir. 1987); Flores v. United States, 551 F.2d 1169, 1174 (9th Cir. 1977), but have disagreed as to the requisite quantum of evidence, compare Oxford Capital, 211 F.3d at 283 (requiring "substantial evidence"), with Flores, 551 F.2d at 1176 n.8 (requiring only a "preponderance of the evidence"). We do not take up this dispute as the evidence in this case satisfies even the more stringent substantial evidence standard. Once the government has cleared its hurdle, the plaintiff retains the ultimate burden to prove that the levy was wrongful. Security Counselors, 860 F.2d at 869.

---

[3]Scoville argues that the government must further prove that it had probable cause for the levy at the time that it occurred, directing us to Flores v. United States, 551 F.2d 1169, 1174-75 (9th Cir. 1977), and Oxford Capital Corp. v. United States, 211 F.3d 280, 287 (5th Cir. 2000). We do not reach this issue as the record indicates that the government did in fact have such probable cause. In 1991, a former colleague of Dr. May's informed the IRS that May had told him that he had divorced Scoville in order to put his (May's) house and office equipment in her name.

In this case, the government bore the burden of proving a nexus between May and the proceeds of the insurance contract.  Scoville then bore the burden of proving May lacked any interest in those proceeds.  Whether May had such an interest is a question of state law.  United States v. Rodgers, 461 U.S. 677, 683 (1983).  We review the district court's application of state law de novo, and review its factual findings for clear error.  Lincoln Benefit Life Co. v. Edwards, 243 F.3d 457, 461 (8th Cir. 2001).

A nominee is one who holds bare legal title to property for the benefit of another.  Black's Law Dictionary (7th ed. 1999).  Under Missouri law, one who holds such title has no actual interest in the property, which remains with the beneficial owner.  H. B. Deal Const. Co. v. Labor Discount Center, Inc., 418 S.W.2d 940, 946 (Mo. 1967); National Refining Co. v. Continental Dev. Corp., 189 S.W.2d 551, 553 (Mo. 1945).  No Missouri court has delineated a precise test for determining whether a property holder is a nominee.  Missouri courts have, however, provided a test for determining whether a conveyance is fraudulent.  In such instances, Missouri courts look to "badges of fraud" which include:

> (1) a conveyance to a spouse or near relative; (2) inadequacy of consideration; (3) transactions different from the usual method of transacting business; (4) transfers in anticipation of suit or execution; (5) retention of possession by the debtor; (6) the transfer of all or nearly all of the debtor's property; (7) insolvency caused by the transfer; and (8) failure to produce rebutting evidence when circumstances surrounding the transfer are suspicious.

First Home Savs. Bank v. C & L Farms, Inc., 974 S.W.2d 621, 626 (Mo. Ct. App. 1998).  These elements parallel those we have looked to in determining whether a property holder is in fact merely a nominee.  For instance, in Loving Saviour Church v. United States, 728 F.2d 1085, 1086 (8th Cir. 1984), applying South Dakota law, we looked to factors including whether the purported beneficial owner made personal use

of the assets nominally held by another, how the assets were insured and managed, the relationship between the parties or entities, and whether consideration was paid for transfers. In Shades Ridge Holding Co. v. United States, 888 F.2d 725, 728 (11th Cir. 1989), the court observed that both federal and state laws apply the same basic notion in determining whether someone acts as a nominee–looking for who has "active" or "substantial" control. Accord Valley Finance, Inc. v. United States, 629 F.2d 162, 171-72 (D.C. Cir. 1980). We think that faced with a similar situation, a Missouri court would likely apply this body of law.

Regardless of whether the relationship between May, Scoville and the property at issue was actually fraudulent, the evidence amply demonstrates May's retention of a beneficial interest in the farm and the insurance policy sufficient to carry the government's burden. The divorce agreement gave Scoville the farm along with most of May's property, including his dentistry equipment. Scoville could not name any item of property retained by May. May continued to live at and make use of the farm, and to treat it as his own. Chalender testified that May paid off the outstanding mortgage on the farm, and May dealt directly with the insurance adjustors when Scoville was in Costa Rica. The district court found that May structured all his dealings so as to protect his assets from taxation, and discredited all testimony to the contrary. Based on all the evidence before it, the district court found Scoville acted as May's nominee, a finding which is not clearly erroneous.

Scoville argues that under Missouri law, insurance proceeds are personal property and not subject to liens previously attached to the insured property. We note first that in Phelps v. United States, 421 U.S. 330, 334-35 & n.5 (1975), the Supreme Court held that a tax lien runs to the thing owned by the taxpayer and anything substituted for it. In this case, the insurance proceeds were certainly substituted for the destroyed farm. Whether the Supreme Court intended to create a substantive federal rule of property law, supplanting state law to the contrary, is unclear. We need not

reach that question, however, because Missouri law does not dictate a contrary outcome.

Scoville directs us to <u>Herpel v. Farmers Ins. Co.</u>, 795 S.W.2d 508, 510 (Mo. Ct. App. 1990), which states that "where a property owner insures the property for his or her sole protection, a lienholder has no cognizable interest in the insurance policy." In this case, Scoville did not act "for her . . . sole protection" as required in <u>Herpel</u>. The district court found that despite the fact that the insurance payments were payable to Scoville, May was her sole source of income–he provided her with funds for property upkeep, paid off the mortgage and treated the property as his own. These facts support the conclusion that Scoville acted as May's nominee, not only in owning the farmhouse, but also in procuring the insurance policy.[4] Because she was acting on May's behalf, he gained a beneficial interest in the proceeds of the insurance contract. <u>See</u> 3 Couch on Insurance § 42:73 (3d ed. 1997). As required by federal law, the tax lien attached to this interest as well as to May's pre-existing interest in the farm.

The government amply carried its burden in proving a nexus between May and the insurance proceeds. The burden of proof thus shifts back to Scoville to prove that in fact May had no such interest upon which to levy. We agree with the district court that Scoville did not satisfy this burden. Scoville failed to prove to whom the purchase money belonged, failed to explain her and May's course of conduct, and failed to adequately develop any factual or legal basis which would nullify May's beneficial interest in the farm or the insurance proceeds.

---

[4]Scoville also appeals the district court's conclusion that the State Farm insurance policy also covered May. The policy covered the named insured along with relatives who were members of her household. Given our resolution of the nominee question, we do not take up this challenge.

Scoville also appeals the district court's ruling permitting Chalender and Stroud to testify by deposition.  We have considered Scoville's arguments and find them without merit.

Accordingly, the judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.