RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0441p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PEGGY ANN SCHAEFER SPOTTS,

*Plaintiff-Appellant,*

*v.*

No. 04-5955

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 03-00529—Joseph M. Hood, Chief District Judge.

Submitted: October 27, 2005

Decided and Filed: November 14, 2005

Before: MARTIN, GIBBONS, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ON BRIEF:** Patricia M. Bowman, Jonathan S. Cohen, UNITED STATES DEPARTMENT OF JUSTICE, TAX DIVISION, Washington, D.C., for Appellee. Peggy Ann Schaefer Spotts, Nicholasville, Kentucky, pro se.

---

## OPINION

---

BOYCE F. MARTIN, JR., Circuit Judge. Peggy Spotts brought this quiet title action seeking to remove a nominee federal tax lien filed by the Internal Revenue Service for taxes owed by her former husband, Ray Spotts. The district court denied Peggy Spotts's motion for summary judgment and granted summary judgment in favor of the Service. Peggy Spotts timely appealed.

The district court made the following statement of facts:

The case sub judice is a quiet title action filed in the Jessamine County Circuit Court brought under 28 U.S.C. § 2410, seeking the removal of the nominee tax lien filed by the Internal Revenue Service against the real estate located at 1000 Delaney Woods Road, Nicholasville, Kentucky 40356. The United States removed the action to this Court pursuant to 28 U.S.C. § 1444.

The facts are as follows. Charles Matich operated an asset protection program designed to reduce a person's tax liability and hide assets from the Internal Revenue Service ("IRS") and

other creditors through the use of offshore bank accounts. Matich would set up a Nevada limited liability company to receive a portion of a client's income. The limited liability company would send the funds by wire to an account in the Barclay Bank, in Grand Turk, Turks and Caicos, British West Indies. The account was in the name of Orion Holding Company, another company controlled by Matich. A debit card account was set up for each client at the TSB Bank in the Isle of Jersey. When a client needed money, he would notify an employee of Matich if Grand Turk and she would wire the needed funds to the debit card account. The client would then make purchases with his offshore funds by using the debit card. Both Grand Turk and Isle of Jersey have stringent bank secrecy laws and the records of bank accounts in these places can not be reached by legal process.

In 1990, Matich traveled to Columbus, Ohio and explained the asset protection program to Defendant Peggy Spotts and her ex-husband Ray Spotts. In the summer of 1994, Ray and Peggy Spotts traveled to California and discussed the asset protection program with a member of an accounting firm who allegedly confirmed Matich's legitimacy. Peggy and Ray Spotts became clients of Matich and his offshore protection program in 1994. Ray Spotts would have commissions and other taxable income due him sent to Proven Triumphs, LLC, the Nevada LLC set up for Spotts by Matich as a part of the asset protection program. These funds were then sent to Orion Holding Company's account at Barclay Bank. Ray Spotts gained access to the money through a debit card account at the TSB Bank.

In the summer of 1996, the Spotts purchased a home located at 1000 Delaney Woods Road, Nicholasville, Kentucky. Ray Spotts wire transferred approximately $180,000.00 of the funds from Proven Triumphs to the account at Barclay Bank in Grand Turks. This $180,000, along with $20,000.00 on loan from Orion Holding Company, were forwarded to the settlement officer at the time of settlement on the purchase of the home. To disguise the fact that the Spott's were using their own money to purchase the home, and as protection against creditors, Ray and Peggy Spotts executed a note to Orion Bank and Trust, another Grand Turk company controlled by Matich, for $200,000.00. This note was secured by a mortgage on the home. Orion Bank and Trust then forwarded the $200,000 to the settlement officer in the guise of loan proceeds. The home was purchased for $272,500.00, with the balance of the purchase price coming from Peggy. Although the note and mortgage with Orion Bank and Trust were in the names of both Ray and Peggy Spotts, the deed was placed solely in Peggy Spotts' name to, among other things, protect it from business creditors.

In September 1998, Peggy Spotts filed for divorce. Ray Spotts moved out of their home and consulted a divorce attorney who in turn advised Ray to consult a tax attorney concerning his 1994 through 1997 tax returns and the failure to report the funds sent offshore. In August 1999, Ray filed amended tax returns for 1994-1997 and along with these returns Ray paid the increased tax liabilities for 1994 and 1995. Ray failed to pay the reported increased liabilities for 1996 and 1997 totaling $375,598. These additional tax liabilities were assessed against Ray by the Service on November 8, 1999. On November 1, 2002, the Service filed the nominee tax lien at issue and Peggy thereupon filed this action to quiet title.

## I.

We review a district court's grant of summary judgment de novo. *Bennett v. Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Because Peggy Spotts is proceeding pro se, we construe her filings liberally. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (granting liberal construction to pro se filings).

The tax code provides for federal tax liens through 26 U.S.C. § 6321. That section provides that "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321.[1] Section 6322 provides that "the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C. § 6322.

A federal tax lien does not arise or attach to property in which a person has no interest under state law. *See United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985) ("[I]n application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property.") (internal citations omitted). Once state law determines that a property interest exists, federal law dictates the tax consequences. *Id.* at 722; *Drye v. United States*, 528 U.S. 49, 58 (1999) ("[One] look[s] to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as property or rights to property within the compass of federal tax lien legislation."). The Supreme Court has broadly interpreted section 6321 to include not only the property and rights to property owned by the delinquent taxpayer, but also property held by a third party if it is determined that the third party is holding the property as a nominee or alter ego of the delinquent taxpayer. *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977).

Thus, before determining what, if any, federal tax consequences attach, we must first address the pertinent questions of state property law. When the Spottses purchased the home at issue the property was titled solely in Peggy's name. According to the Kentucky Supreme Court, "it has long been the law in Kentucky that '[r]ecord title or legal title is an indicia sufficient to raise a presumption of true ownership.'" *Rakhman v. Zusstone*, 957 S.W.2d 241, 244 (quoting *Tharp v. Security Ins. Co. of New Haven,* 405 S.W.2d 760, 765 (Ky. 1966)). Moreover, in *O'Donnell v. O'Donnell*, the court quoted 54 Am.Jur., Trusts, § 205 with approval for the proposition that

> a conveyance on a consideration from a husband, parent, or other person, where title is taken in the name of the wife, child, or other natural object of the purchaser's bounty, generally does not raise, and, on the contrary, rebuts, a resulting trust, and raises a presumption of a gratuitous settlement on the wife, child, or other object of the bounty . . . But the presumption of a settlement or gift is rebuttable by proof of a contrary intention, and on such rebuttal a resulting trust arises.

202 S.W.2d 999, 1000 (Ky. 1947). In *Rakhman*, the Kentucky Supreme Court also quoted from the RESTATEMENT (SECOND) OF TRUSTS, § 442 (1959) that: "Where a transfer of property is made to one person and the purchase price is paid by another and the transferee is a wife, child or other natural object of bounty of the person by whom the purchase price is paid, a resulting trust does not arise unless the latter manifests an intention that the transferee should not have the beneficial interest in the property." *Rakhman*, 957 S.W.2d at 244. Likewise, the Kentucky Supreme Court has stated that "[i]t is well settled in this state that a person does not acquire an interest in property solely because the property in question was purchased with funds belonging wholly or in part to such person." *Bryant's Adm'r v. Bryant*, 269 S.W.2d 219, 222 (Ky. 1954).

---

[1]Neither the Code itself nor the Federal Regulations mention nominee tax liens. The Internal Revenue Manual, a document published by the Service and provided to agents states that, "[t]o establish a nominee lien situation, it must be shown that while a third party may have legal title to the property, it is really the taxpayer that owns the property and who enjoys its full use and benefit." Internal Revenue Manual 5.17.2.4.8.2 (10-31-2000). As the Service noted in a letter to Ray's tax counsel, "a nominee filing should only be done where the facts and circumstances attending the purchase and/or transfer of property clearly show that the property was acquired and/or transferred in the name of another with a specific intent on the part of a taxpayer to evade or defeat the payment of a known tax liability."

In *Rakhman*, the Kentucky Supreme Court further held that when property is titled in the name of the natural object of one's bounty, that "is of itself a circumstance sufficient to raise an inference that a gift was intended, and the burden is upon the payor seeking to enforce a resulting trust to provide that he did not intend to make a gift to the transferee." *Rakhman*, 957 S.W.2d at 244 (quoting Restatement (Second) of Trusts § 442 cmt. b (1959)). According to the court, "[t]o overcome that presumption, [the payor] must produce 'the same quantum of evidence as is required to overcome any other rebuttable presumption.'" *Id.* at 245 (quoting *O'Donnell*, 202 S.W.2d at 1000).

In his deposition, Ray testified that there were two reasons for titling the home in Peggy's name. Ray testified that:

> There were two reasons. The number one reason was that our marriage was very, very shaky, okay. And I felt for security, this was the number one reason, that if she had the house in her name, that she would feel more secure. That's what I – that was my number one reason, okay. I didn't want to be divorced. I don't believe in divorce. Even though I've been divorced from her twice, I never wanted any of them, okay. Didn't want the first one, didn't want the second one. I didn't believe in divorces. The second reason was that I felt this way about business, is I'm the front dog on the business. If anybody's going to get sued, it would be me. So, have the house in her name so that it's protected that way, so if I ever get sued, you know, there's still something left, you know. Because she was not in the forefront of the business.

In a letter to Ray's tax counsel in 2000, the Service itself recognized the relevance of the Kentucky Supreme Court's decision in *Rakhman*. The *Rakhman* decision declined to impose a constructive trust, i.e., declined to apply nominee theory, and instead determined that a home purchased entirely with the man's funds but titled in the name of the woman with whom he cohabited and bore children was a gift because she was the natural object of his bounty. Noting the applicability of *Rakhman*, the Service conceded that "[i]ndisputably, in this instance, Peggy Spotts, as the spouse of Lewis R. Spotts, may be viewed as a natural object of his bounty at the time that the subject real property was acquired." The Service further conceded in this letter that "had this property been acquired and titled in a more conventional manner, i.e., in the names of both Lewis R. Spotts and Peggy Spotts, the result would have been their holding of the property as tenants by the entireties. As [the Service has] related to you previously, this fact mitigates against concluding that Peggy Spotts now holds the property as a mere nominee for Lewis R. Spotts."

## II.

The district court did not look to Kentucky law to determine whether Ray had any property interest in the house. Instead, the district court considered the law sometimes applied by other courts. *See Towe Antique Ford Found. v. IRS*, 791 F. Supp. 1450, 1454 (D. Mont. 1992), *aff'd*, 999 F.2d 1387 (9th Cir. 1993) (noting that in situations where a forum state does not have clear law on the issue, federal courts have looked to the decisions of other courts for guidance).[2] As discussed above, however, Kentucky does have

---

[2]Many courts use six factors in evaluating nominee questions:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.

*See Porta-John of America, Inc. v. United States*, 4 F. Supp. 2d 688, 701 (E.D. Mich. 1998). Although the district court analyzed the Service's claim using these factors and the Service's brief argues within the same, we caution that rigid adherence to these factors may not be appropriate for every case. The factors used by courts to determine nominee status are most enlightening when the alleged nominee and the alleged true beneficial owner have the type of relationship where both individuals would not normally

law that provides guidance on nominee theory, though it discusses the theory using the term "constructive trust" — that is, Kentucky law seeks to determine whether a titled owner merely holds the property in a constructive or fictitious trust for the true beneficial owner.

Because there is no indication that the district court applied Kentucky law before determining the scope of the federal tax lien we must reverse. Ray's deposition provides an indication of two reasons for titling the home in Peggy's name — (1) to make Peggy feel more secure in the marriage and (2) to insulate business assets from creditors. We hesitate in the first instance to make findings under Kentucky law regarding the first factor though Ray's testimony does indicate some benevolent motivation.[3]

Furthermore, the Service recognizes in its brief that, "the pertinent question in this case [] is taxpayer's interest in the property *at the time the lien arose, in 1999, when the taxes were assessed.*" Resp. Br. at 25 (emphasis in original). We note that by the time the lien arose, Ray had not lived in the house or derived any beneficial interest related to the house for more than fourteen months. Thus, at the time the lien arose, Ray had neither title nor possession. When viewing the facts in the light most favorable to Peggy, it is far from evident that Peggy held the house as a mere nominee and that Ray was the true beneficial owner, and therefore, we cannot conclude that summary judgment was appropriate.

### III.

We therefore vacate the district court's grant of summary judgment in favor of the United States and remand for the district court to consider, with appropriate deference to Kentucky law, whether Ray has any property interest in the home, and if so, to what extent the lien attaches.

---

be expected to simultaneously act as true owners. The factors are less probative in the context of a home purchase by a married couple because even if the home is only titled in one name, both ordinarily act as true owners. Stated another way, several of the factors used by courts will provide the same answer for *every* marital relationship in this context, thus providing little utility in distinguishing tax shames from legitimate titling decisions between spouses. Regardless, the ultimate inquiry requires consideration of all the facts and circumstances to determine the true beneficial owner of the property.

[3]Additionally, the Kentucky Supreme Court has refused to impose a constructive trust "unless the [transferor] manifests an intention that the transferee should not have the beneficial interest in the property." *Rakhman*, 957 S.W.2d at 244. Whether Ray intended for his wife to have any beneficial interest in the home can be addressed on remand.