In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 06-1298

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

PETER SWAN, JANE HARRIS,
    JOEN TOWNE, and THOMAS TOWNE,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3020—**Amy J. St. Eve**, *Judge*.

———————

ARGUED SEPTEMBER 6, 2006—DECIDED NOVEMBER 1, 2006

———————

Before FLAUM, *Chief Judge*, and BAUER and POSNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The government wants to foreclose a tax lien on a house in Libertyville, Illinois, a fancy distant suburb of Chicago. The house is occupied by its former owners, Thomas and Joen Towne, who owe the government back taxes. But it is owned by Peter Swan and his wife Jane Harris, and they alone have a financial stake in avoiding foreclosure. After a one-day bench trial the district court awarded judgment to the defendants, which means, as a practical matter, to Swan and Harris.

A federal tax lien attaches to "all property and rights to property, whether real or personal," of a federal taxpayer. 26 U.S.C. § 6321. State law determines what property rights the taxpayer has, *Drye v. United States*, 528 U.S. 49, 58 (1999); *United States v. Bess*, 357 U.S. 51, 55 (1958); *United States v. Librizzi*, 108 F.3d 136, 137 (7th Cir. 1997), because, as the Supreme Court said in a related context, "the federal statute creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *United States v. National Bank of Commerce*, 472 U.S. 713, 722 (1985). Federal law determines whether those rights are the sort of rights to which a lien attaches, *United States v. Craft*, 535 U.S. 274, 278-79 (2002), but there do not appear to be any relevant differences between state and federal law in this case.

The government argues that the Townes are the real owners of the house in which they live, and if this is right then the government can seize the house to satisfy its tax claim against them. But if they are merely tenants, the government can no more seize the house than it could seize Trump Tower because one of its tenants owed back taxes.

The amount of the asserted lien, as of October 2004, was about $329,000, and was based on taxes owed by the Townes for the tax years 1988 through 1997 (except 1990 and 1992). No doubt the amount is significantly more today because of accrual of interest, so foreclosure may wipe out most of the Swans' equity in the house, for which they paid $296,000 in 2003, though this depends on how much the property has appreciated since then.

Mr. Towne has lived in the house since 1976 (we don't know the date of his marriage to Joen), and apparently he owned it until 1987, when the mortgagee foreclosed and obtained a judicial deed to the house. The mortgagee

sold the house the following year to a friend of Towne's named Jack Shull, who leased the house back to the Townes. The Townes eventually defaulted on the payments called for by the lease, and in 1999 Shull filed a suit in state court to evict them. They resisted eviction and the matter was settled in 2001 by the intervention of the Mary V. Sams Revocable Trust. Mary Sams is Mr. Towne's mother-in-law and, it appears, controls the trust. The trust bought the house from Shull for $219,000 and promptly leased it back to the Townes. The following year, however, the Townes having again defaulted, the trust brought a suit to evict them. The Townes were represented in the suit by Peter Swan, who is a lawyer. The suit was settled. The essential terms of the settlement were that the Townes could for four months direct that the house be sold to anyone of their choice, provided that they repaid the trust $296,000 from the proceeds of the sale. Since they could direct that the house be sold to themselves, they had in effect an option to buy (back) the house for $296,000. If they did not sell the house within the four-month period and remit the agreed sum, the trust would be entitled to take possession of the house—that is, to evict the Townes.

In August 2003, shortly before the expiration of the four-month period, Swan and his wife agreed to buy the house from the trust for $296,000. The Swans, to whom the Townes had directed the sale, agreed that the Townes could continue to live in the house for 24 months, apparently at below-market rent, and during that time they would have the right to buy the house by paying the Swans what the Swans had paid for it, $296,000, plus interest and costs. If the Townes did not buy the house within that period, but the Swans later sold it for more than $420,000, the Townes would be entitled to the difference between the sale price and $420,000.

The house was not sold during the 24-month period; indeed, it has not been sold yet. The Townes are living there still, determined not to leave until their last child graduates from high school. The Swans would like to sell the house—they would be entitled to the appreciation over their purchase price up to $420,000—but they cannot sell it at a decent price until the dispute over the government's lien is resolved.

The government has two theories for why it can foreclose the lien on the house even though the owners of the house are not the taxpayers. The first is that the rights that the Townes acquired in their former house by virtue of the transactions that we've described are property rights within the meaning of the federal tax lien statute. But the rights that they acquired other than those of a tenant, which as we said are not property rights within the meaning of the lien statute, were a four-month and later a 24-month option to buy the house for $296,000, a right to direct the sale of the house to someone else if the first option was not exercised, and a right to sale proceeds above $420,000 should the second option not be exercised and the house later be sold to someone else.

The grant of an option is enforceable in Illinois, but as a contract right, not a property right. *Keogh v. Peck*, 147 N.E. 266, 269 (Ill. 1925); *Artful Dodger Pub, Inc. v. Koch*, 596 N.E.2d 39, 42 (Ill. App. 1992); *Fried v. Barad*, 530 N.E.2d 93, 99 (Ill. App. 1988). The government argues that this doesn't matter, that a contract right can be recharacterized as a property right. Even if this is true (a proposition for which we can find no support in Illinois law, though we have found California cases which treat an option to purchase land as a property right for eminent-domain purposes, e.g., *San Jose Parking, Inc. v. Superior Court*, 110 Cal. App. 4th 1321, 1326-

27 (2003); *Claremont Terrace Homeowners' Ass'n v. United States*, 146 Cal. App. 3d 398, 406 (1983)), all it would imply is that the government could foreclose a lien on that right, not that it could foreclose a lien on the property that would have been acquired had the option been exercised and the Townes acquired title to the house. The government does not argue for that alternative relief, or attempt to value either option or the right to direct the sale to someone else.

The government's other argument is that the Swans are merely "nominees" or "alter egos" of the Townes. That is a better theory, *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 351 (1977); *Scoville v. United States*, 250 F.3d 1198, 1202-03 (8th Cir. 2001); *Oxford Capital Corp. v. United States*, 211 F.3d 280, 282-86 (5th Cir. 2000) (per curiam), though it failed for want of proof in the district court. Suppose a person who wants to evade taxes parks his property with a friend or family member. That would be a fraudulent conveyance, and so the person to whom the property was conveyed would be deemed the taxpayer's "nominee" and forced to cough it up. See *Scoville v. United States*, *supra*, 250 F.3d at 1202-03; *Shades Ridge Holding Co. v. United States*, 888 F.2d 725, 728-29 (11th Cir. 1989); *Loving Saviour Church v. United States*, 728 F.2d 1085, 1086 (8th Cir. 1984) (per curiam). Because Mary Sams was the mother of one of the taxpayers and the mother-in-law of the other, and because Swan describes himself as a "friend" of Mr. Towne as a result of having represented him in an unrelated case shortly before he became his attorney in the Townes' dispute with Mary Sams, the government smells a rat. But it presented little evidence that would have enabled the court to find the rat—little evidence that the Townes ever had a property interest that Shull, or Sams, or the Swans tried to keep out of the hands of the government.

The Townes lost the house to their mortgagee the year before they began underpaying their taxes. The mortgagee sold the property to Shull, Shull to the Sams Trust, the Sams Trust to the Swans. Shull and Swan were friends of Towne, and there was a family relation in the case of the trust, but transactions among friends or even relatives are not presumptively fishy—they minimize information and brokerage costs. There is no evidence that Shull was a "nominee" of Towne, and the only indication that the trust and the Swans may have been nominees was that they must have known that the Townes had little or no incentive to sell the house, since any money they received from the sale would in all likelihood be seized by the government. Why then did the trust and the Swans grant the Townes options to buy the house? Why did they think the Townes would if they didn't exercise the options make a serious effort to sell the house? Yet there is no evidence that the trust or the Swans *wanted* the Townes to remain as squatters until the last cygnet left the nest for—and yet the Swans knew that the Townes had stiffed all of their previous landlords and had successfully resisted eviction (and had stiffed the IRS as well); how could they have intended anything other than what has occurred? What's more, the Swans apparently have not tried to evict the Townes.

Maybe the Townes directed the sale of the house to the Swans at the bargain-basement price of $296,000 as a quid pro quo for the Swans' letting the Townes continue to live in the house, and at a bargain rental rate. (For if the Townes had directed a sale at a higher price, the government might have seized the difference—the part of the proceeds to which the Townes would be entitled—and the new owner would either have kicked them out or charged them the market rental rate.) Such a collusive scheme between the Townes and the Swans would if proved have subjected both

couples to legal sanctions, but is not argued by the government, which insists that the Townes should be regarded as the real owners of the house, which they have not been for the last 20 years.

Anyway the government had its trial; it was for the district judge to untangle these knots; and the judge's finding that the Townes are not the real owners is not clearly erroneous and therefore binds us.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*