**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DONNA M. HOLMAN,

    Plaintiff-Counter-
Defendant- Appellee/Cross-
Appellant,

    v.

UNITED STATES OF AMERICA,

    Defendant-Counter-Claimant-
Appellant/Cross-Appellee.

Nos. 05-4114, 05-4123

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 1:02-CV-77-J)**

---

Thomas N. Thompson, (James C. Haskins with him on the briefs), Haskins & Associates, Salt Lake City, Utah, for the Plaintiff-Counter-Defendant-Appellee/Cross-Appellant.

John A. Nolet, United States Department of Justice, Tax Division, Washington, D.C. (Thomas J. Clark, United States Department of Justice, Tax Division, and Eileen J. O'Connor, Assistant Attorney General, with him on the briefs), for the Defendant-Counter-Claimaint-Appellant/Cross-Appellee.

---

Before **HENRY**, **MURPHY**, Circuit Judges, and **FIGA**, District Judge[*]

---

**HENRY,** Circuit Judge.

---

Donna Holman filed this quiet title action against the United States after the IRS filed a tax lien on real property in Centerville, Utah, to which she and a friend of her husband Kenneth Holman held legal title. The IRS's lien arose out of assessments against Mr. Holman for unpaid employment taxes. Mrs. Holman asserted that she and her husband's friend, Hyrum Smith, held the Centerville property free and clear of the tax lien. The IRS responded by filing a counterclaim alleging that both Mrs. Holman and Mr. Smith held the property as nominees for Mr. Holman and seeking to enforce the lien.

The district court ruled that (1) Mrs. Holman held an undivided half-interest in the property in her own right, not as a nominee for Mr. Holman; but (2) Mr. Smith held an undivided one-half interest in the Centerville property as a nominee of Mr. Holman. The court based the former ruling on the fact that Mr. Holman had never transferred legal title to the property to Mrs. Holman. As a result, the district court concluded, the federal tax lien was enforceable only as to the half-interest held by Mr. Smith.

---

[*] The Honorable Phillip S. Figa, United States District Judge for the District of Colorado, sitting by designation.

The IRS now appeals the district court's ruling that a transfer of legal title was required to enforce the nominee lien. Mrs. Holman has filed a cross-appeal, maintaining that the district court erred in characterizing Mr. Smith's interest in the property. According to Mrs. Holman, Mr. Smith held title to the Centerville property as her nominee, not as Mr. Holman's nominee.

With regard to the IRS's appeal, we agree that a formal transfer of legal title from Mr. Holman to Mrs. Holman is not required in order to enforce the lien. However, we further conclude that the IRS must establish that Mr. Holman held an interest in the property under Utah law. Because the district court did not undertake this state-law inquiry, we vacate its decision and remand for further proceedings. As for Mrs. Holman's cross-appeal, we also conclude that further proceedings are warranted.

## I. BACKGROUND

Kenneth Holman is a Utah real estate developer whose businesses became delinquent in paying federal employment taxes. In April 1988, the IRS determined that Mr. Holman was liable for $250,616.13 under 28 U.S.C. § 6672 for willfully failing to pay income and social security taxes withheld from the wages of his employees from 1984 through 1987. In October 1990, the IRS determined that Mr. Holman was liable under § 6672 for an additional $6,674.54, representing unpaid employment taxes for the second quarter of 1989. The IRS provided Mr. Holman with notice and a demand for payment of these assessments.

In 1990, the Holmans moved into a house located at 177 West 1500 North in Centerville, Utah, after an apartment that they were renting was subjected to foreclosure. The Centerville property was owned by Hyrum Smith and his wife, but, by 1990, Mr. Smith was interested in moving to a smaller residence. Mr. Holman realized that because of the tax assessments that had been filed against him and because Mrs. Holman had no income of her own, they could not qualify for a loan to purchase the Centerville property. Mr. Smith agreed that, in exchange for providing an apartment to him and paying an additional $400 in rent, the Holmans and their children could live there.

In 1991, the Holmans agreed to purchase the Centerville property from Mr. Smith. Mr. Smith and his wife executed a warranty deed transferring title to Mrs. Holman. The Smiths and Mrs. Holman also executed a trust deed that identified Mrs. Holman as the trustor and the Smiths as beneficiaries. The trust deed stated that it was to secure the payment of $190,000 for the purchase price of the property. The Smiths remained indebted to Crossland Mortgage on a first mortgage on the property.

In 1993, Crossland Mortgage discovered the trust deed between Mrs. Holman and the Smiths. The mortgage company concluded that the deed triggered a due-on-sale clause in the Smiths' loan agreement. Mr. Holman and Mr. Smith then arrived at a new agreement under which Mr. Smith and Mrs. Holman would become a co-owners of the Centerville property and Mr. Smith would co-sign a

new loan. Accordingly, on October 25, 1993, Mrs. Holman transferred the property by quitclaim deed to herself and Mr. Smith as tenants in common. On the same day, Mrs. Holman and Mr. Smith jointly executed a trust deed in favor of Utah Mortgage Corporation, granting it a mortgage on the property to secure repayment of the new loan.

At the bench trial before the district court, Mr. Smith gave testimony as to the reasons for the 1993 transaction: he said that he wanted to assist the Holmans in their efforts to refinance the property. He explained that he discussed this transaction with Mr. Holman but not with Mrs. Holman. Mr. Smith also stated that he had no genuine interest in the property.

Throughout the 1990s, the Holmans made the mortgage payments on the Centerville property. The IRS sought to collect employment taxes from Mr. Holman but was not successful. Finally, in April 2002, with the unpaid balance of the assessments, with accrued interest, equaling $820,833.85, the IRS filed a lien on the Centerville property.

Mrs. Holman then brought the instant action seeking to quiet title to the house free and clear of the tax lien asserted by the IRS. The IRS filed a counterclaim against Mrs. Holman. The IRS asserted that Mrs. Holman and Mr. Smith held the Centerville property only as nominees of Mr. Holman. As a result, the IRS contended, it was entitled to enforce the tax lien on the property.

Six days after Mrs. Holman filed the quiet title action, the IRS filed a separate action in the District of Utah. The IRS sought to reduce the unpaid balance of the tax assessments against Mr. Holman to judgment. In March 2004, the district court entered judgment for the United States and against Mr. Holman for $892,666.22, plus interest. Mr. Holman has not appealed that judgment.

In this quiet title action, Mrs. Holman argued that she was not her husband's nominee and that, as a result, the federal tax lien could not be enforced against the Centerville property. In contrast, the government argued that requisite factors were present to establish that Mr. Smith and Mrs. Holman held title to the property as Mr. Holman's nominees, and that the property was therefore subject to the federal tax lien. The IRS relied on the following factors to establish that Mrs. Holman was merely a nominee of Mr. Holman: (1) Mr. Holman exercised dominion and control over the property; (2) Mrs. Holman paid little or no consideration for the property; (3) Mr. Holman orchestrated the transaction to place the property in Mrs. Holman's name only after a federal tax lien had attached to the property; (4) there was a close relationship between the Holmans; and (5) Mr. Holman continued to enjoy the benefits of the property. After the bench trial, the district court reached contrasting results with respect to the IRS liens asserted against the interests held by Mr. Smith and Mrs. Holman.

As to Mrs. Holman's interest in the property, the court concluded that she was <u>not</u> Mr. Holman's nominee but rather held the property in her own right. The

court acknowledged that there was considerable evidence supporting the IRS's theory that Mrs. Holman held title as Mr. Holman's nominee. In particular, Mr. Holman had provided the vast majority of funds used to pay the mortgage and household expenses. He received the benefit of the mortgage interest deduction by claiming the interest paid on the mortgage against the Holmans' joint income, which for nine of eleven years consisted of Mr. Holman's earnings only. Mr. Holman paid $12,797.94 in closing costs for the 1993 refinancing, and, in applying for several loans, he indicated that the Centerville property was his asset.

Nevertheless, the court concluded that because Mr. Holman had never transferred legal title to the Centerville property to Mrs. Holman, she could not be considered his nominee. Thus, the court found that Mr. and Mrs. Holman owned the Centerville property as tenants in common each with a one-half undivided interest in the whole.

In contrast, as to Mr. Smith's interest in the property, the court observed that "on August 14, 2003, both the United States and Mr. Smith signed and filed a stipulated request for judgment that Hyrum W. Smith owned title to the subject property solely as a nominee for Kenneth T. Holman." Aplt's App. vol I, at 62. The court concluded that "Mr. Smith is a record title holder merely as a nominee for Mr. Holman and thus Mr. Holman has at least a one-half undivided interest in the subject property." Id.

Finally, the court held that the IRS's request for foreclosure and sale was premature. The court explained that the new mortgage holder (from the 1993 refinancing) had a security interest in the property and that it was not clear that the IRS had complied with a section of the foreclosure statute requiring notice to lienholders. See 26 U.S.C. § 7403(b) (stating that "[a]ll persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto"). The court denied the IRS's motion to reconsider.

## II. DISCUSSION

On appeal, the IRS argues that the district court erred in concluding that, in order to establish that Mrs. Holman held title to the Centerville house as Mr. Holman's nominee, it was required to prove that Mr. Holman transferred the property to Mrs. Holman. According to the IRS, the district court's requirement of a transfer of property is at odds with the decisions of several courts of appeals (including this one) that have enforced nominee liens absent a formal transfer of property from the delinquent taxpayer to a third party.

In response, Mrs. Holman defends the district court's reliance on the lack of a transfer to defeat the IRS's lien. Additionally, in a cross-appeal, she argues that the district court erred in finding that Mr. Smith was Mr. Holman's nominee rather than her nominee.

We begin our analysis with the issue raised by the IRS in its appeal. Then, we turn to Ms. Holman's cross appeal. Most of the relevant facts are undisputed,

and the parties arguments raise legal issues that we examine de novo. See United States v. Harms, 371 F.3d 1208, 1210 (10th Cir. 2004).

## A.  The IRS's Appeal

### 1.  Transfers of Title to Property

The district court held that because "a transfer of the subject property from Mr. Holman to Mrs. Holman . . . has not occurred," Aplt's App. vol. I, at 65, she could not be considered his nominee.  The IRS now challenges that ruling, arguing that it is "unprecedented, and is at odds with the decisions of several courts of appeals that have enforced a nominee tax lien where there was no transfer of property from the taxpayer to his nominee." Aplt's Br. at 29.

We agree.  Under the Internal Revenue Code, the IRS may satisfy a tax deficiency by imposing a lien on any "property" or "rights to property" belonging to the taxpayer.  Drye v. United States, 528 U.S. 49, 55 (1999) (quoting 26 U.S.C. § 6321).  The statutory language "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." Id. at 56 (internal quotation marks omitted).

Accordingly, "property" and "rights to property" may include "not only property and rights to property owned by the taxpayer but also property held by a third party if it is determined that the third party is holding the property as a nominee . . .  of the delinquent taxpayer." Spotts v. United States, 429 F.3d 248, 251 (6th Cir. 2005); see, e.g., Mackin v. United States, 300 F.3d 814, 818 n.2 (7th

-9-

Cir. 2002) ("In the case of a nominee lien, the IRS proceeds against an alter ego or nominee of a delinquent taxpayer for purposes of satisfying the taxpayer's obligations.") (internal quotation marks omitted). The nominee theory focuses upon the taxpayer's relationship to a particular piece of property. Oxford Capital Corp. v. United States, 211 F.3d 280, 284 (5th Cir. 2000). The ultimate inquiry is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership.[1]

Although in many instances the delinquent taxpayer will have transferred legal title to a third party, an actual transfer of legal title is not essential to the imposition of a nominee lien. A delinquent taxpayer who has never held legal title to a piece of property but who transfers money to a third party and directs the third party to purchase property and place legal title in the third party's name may well enjoy the same benefits of ownership of the property as a taxpayer who has held legal title. In both instances, the third party may be the taxpayer's nominee.

---

[1] "Many courts use six factors in evaluating nominee questions: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property." Spotts, 429 F.3d at 253 n.2.

Thus, as the IRS argues, this court has recognized that a tax lien may be enforced when the taxpayer has never held legal title to the property but has directed that title be placed in a third party's name. See United States v. Miller Bros. Constr. Co., 505 F.2d 1031, 1036 (10th Cir. 1974) (holding that a lien could be enforced against property when the taxpayer had directed that legal title be placed in a third party's name and observing that "the fact taxpayer exerted dominion and control over the land from 1952 until his death in 1971 is indicative of ownership"). Other courts have reached the same conclusion. See, e.g., Scoville v. United States, 250 F.3d 1198, 1202-03 (8th Cir. 2001) (holding that a wife was a delinquent taxpayer's nominee and that the taxpayer retained a beneficial interest in a farm and an insurance policy even though the wife held legal title to the farm and the wife was listed as the insured on the policy).

In arguing in support of the district court's conclusion that a transfer of property is required, Mrs. Holman relies primarily on the Second Circuit's decision in LiButti v. United States, 107 F.3d 110 (2d Cir. 1997). However, we do not read LiButti to support Mrs. Holman's position.

In LiButti, the daughter of a delinquent taxpayer filed a wrongful levy action against the IRS seeking to prevent the enforcement of a lien against a racehorse to which the taxpayer's daughter held title. The district court refused to enforce the lien because the IRS had failed to establish that the taxpayer had ever transferred the horse to his daughter. On appeal, the Second Circuit concluded

-11-

that the district court could have drawn adverse inferences from the fact that the taxpayer, who was not a party to the daughter's wrongful levy action, had invoked his Fifth Amendment rights and had refused to answer questions about ownership of the horse. See LiButti, 107 F.3d at 124 (stating that "the circumstances of this case compel the admissibility and consideration by the trial court of [the taxpayer's] refusals to answer the questions addressed to him that struck directly at the only issue before the court–whether he or his daughter was the effective owner").

In reaching that conclusion, the Second Circuit did state that "proof of transfer would be an essential concern." Id. at 119. However, the court subsequently explained that proof of transfer could be accomplished by "finding that [the taxpayer] funded the acquisition and reacquisition of the horse," without a transfer of legal title. Id. at 125 (emphasis added). Thus, the court said, "[i]t is not necessary, therefore, to find that [the racehorse] was transferred from [the taxpayer] to [his daughter]; it is sufficient for nominee and constructive trust purposes if it is found, with the aid of the requisite adverse inference, that [the taxpayer] transferred his money to [his daughter] for the purchase of [the racehorse]." Id. (emphasis added). In our view, that reasoning indicates that a third party may hold property as a taxpayer's nominee if the taxpayer pays for the property and enjoys the benefits of ownership, even though the third party holds legal title and the taxpayer has never held legal title himself.

-12-

Moreover, we disagree with the district court and Mrs. Holman with regard to Second Circuit's reference to "the aid of the requisite adverse inference." Id. That phrase does not indicate that the IRS may only seek to enforce a nominee lien against property to which the taxpayer lacks legal title when the taxpayer has refused to answer questions about ownership of property, as the taxpayer did in LiButti. Instead, the Second Circuit's decision demonstrates only that, on the facts before it, an adverse inference about ownership of the property was warranted: "there was no direct proof that the monies [the daughter] used to purchase and subsequently, repurchase [the racehorse] came from her father," but "[t]he record [was] replete . . . with evidence of [the taxpayer's] use of his daughter and [a company] for secreting his assets and as the conduits for his horse dealings." Id. at 114. In other circumstances, the enforcement of a nominee lien may be warranted even if there is no indication that the taxpayer has refused to answer questions about ownership of the property.

We therefore conclude that the district court erred in holding that, standing alone, the lack of a transfer of legal title to the Centerville property from Mr. Holman to Mrs. Holman is sufficient as a matter of law to defeat enforcement of the nominee lien asserted by the IRS.

### 2. Enforcement of the Nominee Lien Against Mrs. Holman

Because it is not required to establish that Mr. Holman transferred legal title to the Centerville property, the IRS contends that it is now entitled to enforce the

nominee lien under 28 U.S.C. § 6321. Application of the nominee doctrine involves questions of both state and federal law. "We look initially to state law to determine what rights the taxpayer has in the property the [IRS] seeks to reach." Drye, 528 U.S. at 58; see also Spotts , 429 F. 3d at 251 (stating that "[a] federal tax lien does not arise or attach to property in which a person has no interest under state law" and that "before determining what, if any, federal tax consequences attach, we must first address the pertinent questions of state property law"). If the court concludes that the taxpayer has a property interest under state law, then "federal law . . . determine[s] whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of federal tax lien legislation." Drye, 528 U.S. at 58.

The Sixth Circuit's decision in Spotts illustrates the relationship between state and federal law in the nominee lien inquiry. In that case, a delinquent taxpayer's ex-wife filed a quiet title action seeking to remove a nominee tax lien filed by the IRS. The Sixth Circuit reversed the grant of summary judgment to the IRS because "the district court did not look to Kentucky law to determine whether [the delinquent taxpayer] had any property interest in the house." Spotts, 429 F.3d at 252. Although the district court did not cite it, "Kentucky does have law that provides guidance on nominee theory, though it discusses the theory using the term 'constructive trust.'" Id. at 253. "Kentucky law," the Sixth Circuit reasoned, "seeks to determine whether a titled owner merely holds the property in a

-14-

constructive or fictitious trust for the true beneficial owner." Id. Thus, the case was remanded "for the district court to consider, with appropriate deference to Kentucky law, whether [the delinquent taxpayer] has any property interest in the home, and if so, to what extent the lien attaches." Id. at 254.

Here, in light of its erroneous conclusion that a transfer of property was required to enforce the nominee lien, the district court did not resolve the question of whether Mr. Holman had an interest in the Centerville property under Utah law and, if so, whether the IRS's nominee lien could be enforced as a matter of federal law. Accordingly, like the Sixth Circuit in Spotts, we must remand the case so that the district court may undertake these inquires.

We note that the determination that the district court should undertake differs from the approach suggested by the IRS. The IRS cites the factors set forth in federal case law for determining whether a nominee lien may be enforced, see Aplt's Br. at 26-27, 38-44, but refers to Utah law only abstractly, see id. at 48 (stating that "Utah law does not preclude a finding that a title interest in property can be defeated by circumstances establishing that another person has actual beneficial ownership" but declining to offer a specific state law doctrine that, as a applied to these facts, would establish that Mr. Holman has a beneficial interest). Cf. Spotts, 429 F.3d at 253 n.2 (distinguishing between the Kentucky law inquiry regarding the determination of whether the taxpayer had a beneficial interest in the property and the nominee inquiry undertaken by "many [other] courts"). Invoking

-15-

the Supreme Court's decision in Drye, the IRS contends that "[a] uniform federal rule should thus govern whether the nominee theory is to apply." Aplt's Reply Br at 6.

We read Drye differently than the IRS. The Court did state that "the [Internal Revenue] Code and interpretive case law place under federal, not state, control the ultimate issue whether a taxpayer has a beneficial interest in any property subject to levy for unpaid federal taxes." Drye, 528 U.S. at 57. However, before the Court addressed that ultimate federal question, it examined state law to determine "what rights the taxpayer has in the property the Government seeks to reach." Id. at 58. The Court concluded that "Arkansas law primarily gave [the taxpayer] a right of considerable value-the right either to inherit or to channel the inheritance to a close family member." Id. at 60. Such a fact-specific state-law inquiry is required here. See, e.g., Spotts, 429 F.3d at 251 (stating that "before determining what, if any, federal tax consequences attach, we must first address the pertinent questions of state property law").

Like the Kentucky decisions discussed in Spotts, Utah's case law indicates that a party may hold legal title in trust for a beneficial owner. See Parks v. Zion First Nat'l Bank, 673 P.2d 590, 598-600 (Utah 1983) (discussing the doctrine of resulting trusts under Utah law); see also McGavin v. Segal (In re McGavin), 189 F.3d 1215, 1217-19 (10th Cir. 1999) (discussing and applying the doctrine of resulting trusts under Utah law); Taylor v. Rupp (In re Taylor), 133 F.3d 1336,

-16-

1341 (10th Cir.1998) (same).  On remand, the IRS should identify the theory or theories under which it asserts that Mr. Holman has a beneficial interest in the Centerville property under Utah law.  To enforce the tax lien on Centerville property, the IRS must establish that Mr. Holman has such an interest.  If the IRS makes that showing under state law, the district court should then determine as a matter of federal law whether the nominee lien should be enforced, in light of the factors set forth in federal case law.  See, e.g., Spotts, 429 F.3d at 253 n.2 (stating that "[m]any courts use six factors in evaluating nominee questions").[2]

### B.  Mrs. Holman's Cross-Appeal

In her cross-appeal, Mrs. Holman argues that the district court erred in concluding that Mr. Smith was Mr. Holman's nominee.  She contends that Mr. Smith was her nominee, not Mr. Holman's.

### 1.  Standing

The IRS has filed a motion to dismiss the cross-appeal, arguing that Mrs. Holman prevailed below, and thus lacks standing to appeal because she is not an aggrieved party.  See generally Leprino Foods. Co. v. Factory Mut. Ins. Co., 453

---

[2]  We are not persuaded by Mrs. Holman's argument that the fact that there was no written instrument conveying a property interest to Mr. Holman precludes a finding that he is a beneficial owner.  See Parks, 673 P.2d at 597 (stating that "the intended trust may be imposed, notwithstanding the Statute of Frauds violation, under the guise of a constructive trust") (emphasis added).  We leave further development of the legal issues surrounding the IRS's assertion that Mr. Holman has a beneficial interest in the Centerville property under Utah law to the district court on remand.

F.3d 1281, 1290 (10th Cir. 2006) (observing that "[o]nly a party aggrieved by the judgment may appeal" and dismissing a cross-appeal because "[the defendant was] 100% successful") (internal quotation marks omitted).

Mrs. Holman disputes this contention. She notes that when the United States filed a counterclaim asserting that Mr. Smith was the nominee of Mr. Holman, Mrs. Holman filed an answer to the counterclaim denying this allegation. In addition, Mrs. Holman states that she argued to the district court that she was the owner of the entire property.

The record supports Mrs. Holman's assertions. During closing argument, her attorney asserted that she "owns [the Centerville property] 100 percent." Aplt's App. vol. II, at 170. Moreover, after hearing arguments, the district court expressed its view of the parties' positions as follows: "[The IRS] want[s] 100 percent they say of the property and you say Donna [Holman] owns 100 percent." Id. at 172. When the court asked Mrs. Holman's attorney if she had "any less absolute position on that," Mrs. Holman's attorney responded, "[n]ot really, Your Honor, although I think it could be argued that [the Holmans] each own 50 percent. I mean, that's an arguable position . . . . [but] it's not one I would like to argue, but I think it could be argued." Id. at 172-73.

Based on Mrs. Holman's answer to the IRS's counterclaim and her arguments to the district court, we conclude that she has standing to pursue her cross-appeal. In light of her contention that she owned 100 percent of the Centerville house, Mrs.

Holman was aggrieved by the district court's judgment that she held only an undivided one-half interest.

## 2. Merits

In ruling that Mr. Smith held title to the Centerville residence as Mr. Holman's nominee (rather that as Mrs. Holman's nominee), the district court cited Mr. Smith's trial testimony that "all of the negotiations and discussion regarding transfers, financing, and subsequent refinancing of the subject property took place between him and Mr. Holman, that he never had any such discussions with Mrs. Holman, and that he does not recall anything other than rare social interactions with Mrs. Holman." Aplt's App. vol I, at 62. The court also noted that "on August 14, 2003, both the United States and Mr. Smith signed and filed a stipulated request for judgment that Hyrum W. Smith owned title to the subject property solely as a nominee for Kenneth T. Holman." Id.

In her cross-appeal, Mrs. Holman contends that the district court erred in relying on the fact that she was not involved in discussions with Mr. Smith about the refinancing arrangement and on the stipulation between Mr. Smith and the IRS to conclude that Mr. Smith was Mr. Holman's nominee. Mrs. Holman cites Mr. Smith's trial testimony that he viewed the refinancing arrangement as resulting in the property being conveyed to both the Holmans. She notes that her name was on the title to the property and on the underlying mortgage. Thus, she continues, the transfer of property to her and Mr. Smith "was a mere financing arrangement,

-19-

undertaken for the benefit of the true record title owner of the property, Donna Holman." Aple's Opening Br. at 34.[3]

Although the record offers considerable support for the district court's ultimate result, we conclude that this issue must also be remanded to the district court for further proceedings. In particular, as with the issues raised in the IRS's appeal, there is no indication that the district court applied Utah law to determine who had what interests in the Centerville house. See Spotts, 429 F.3d. at 254 (remanding for an application of state law to determine whether a delinquent taxpayer had an interest in the property). We further note that the issues raised in the IRS's appeal (concerning whether Mrs. Holman is Mr. Holman's nominee as to the other one-half interest in the property), may well turn on factual findings regarding the various transactions between the Holmans and Mr. Smith. Cf. Taylor, 133 F.3d at 1341 (noting that under the resulting trust theory recognized in Utah law, the determination of who has a beneficial interest depends upon the intent of the party providing the purchase price). Those factual findings may also affect the characterization of Mr. Smith's interest in the property (i.e, whether he holds legal title as Mr. Holman's nominee or as Mrs. Holman's nominee).

---

[3] Mrs. Holman again invokes the Utah statute of frauds. See Utah Code Ann. § 25-5-3. She reasons that because there was no written instrument conveying an interest in the property to Mr. Holman, Mr. Smith could not be Mr. Holman's nominee. As in the IRS's appeal, we do not find that argument persuasive.

Finally, we note that the fact that Mr. Smith and the IRS filed a request for a stipulated judgment that "[Mr.] Smith owned title to the subject property solely as a nominee for Kenneth T. Holman," Aplt's App. vol. I, at 62, is not dispositive. Whether Mr. Smith holds title as Mr. Holman's nominee is an issue for the court, not the IRS and Mr. Smith, to determine. See United States v. Teeter, 257 F.3d 14, 29 (1st Cir. 2001) (stating that "stipulations [about legal issues] normally are not binding on a court"); Foster Frosty Foods, Inc. v. C.I.R., 332 F.2d 230, 232 (10th Cir. 1964) (stating that "the parties cannot bind the court by stipulation as to what constitutes a dispositive legal question"). Moreover, the determination of Mr. Smith's status may well turn on factual findings regarding the Holmans' intent, a matter as to which the neither the IRS's nor Mr. Smith's views are necessarily controlling.

### III. CONCLUSION

Accordingly, we vacate the district court's grant of summary judgment and remand the case to the district court for further proceedings consistent with this opinion. On remand, the district court should first apply Utah law to determine whether Mr. Holman has an interest in the Centerville house. If it concludes that Mr. Holman does have an interest, the court should then determine whether the lien should be enforced under the standards set forth in the federal case law.