T.C. Memo. 2008-165

UNITED STATES TAX COURT

ARTHUR DALTON, JR. AND BEVERLY DALTON, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23510-06L.              Filed July 7, 2008.

Ralph A. Dyer, for petitioners.

Michael R. Fiore, for respondent.

MEMORANDUM OPINION

WELLS, Judge:  This case is before the Court on respondent's
motion for summary judgment pursuant to Rule 121.[1]  The instant
proceeding arises from a petition for judicial review filed in

_____

    [1] Unless otherwise indicated, section references are to the
Internal Revenue Code of 1986, as amended, and Rule references
are to the Tax Court Rules of Practice and Procedure.

response to identical Notices of Determination Concerning Collection Actions(s) Under Section 6320 and/or 6330 issued separately to each petitioner. The issue to be decided is whether it was an abuse of discretion by respondent's Office of Appeals to reject an offer-in-compromise from petitioners because of an alleged nominee interest in a trust.

## Background

The facts set forth below are based upon examination of the pleadings, moving papers, responses, and attachments.

Petitioners are husband and wife (hereinafter referred to individually as Mr. Dalton Jr. and Mrs. Dalton) who resided in Maine at the time of filing the petition. Before late 1997 petitioners lived and worked in Massachusetts; however, the instant case centers on three parcels of improved real property located off Johnson Hill Road in Poland, Maine (hereinafter referred to individually as lot 3, lot 4, and lot 5, respectively, and collectively as lots 3, 4, and 5, or as the Poland property).

## Acquisition of Lots 3, 4, and 5

By deed dated November 25, 1977, petitioners purchased lot 4, and the deed to lot 4 was recorded with the appropriate county registry on November 28, 1977. Similarly, by deed dated November 24, 1980, petitioners purchased lot 3, and the deed to lot 3 was recorded on December 1, 1980. In connection with the latter

transaction petitioners obtained a bank loan which was secured by a mortgage on lot 3. The mortgage was likewise recorded on December 1, 1980.

By deed dated January 13, 1983, petitioners conveyed lot 3 and lot 4 to Mr. Dalton Jr.'s father, Arthur Dalton, Sr. (Mr. Dalton Sr.).[2] The deed recited that the transfer was made for consideration of $1 and subject to the existing mortgage. Petitioners and Mr. Dalton Sr. executed a notarized assignment and assumption agreement dated April 1, 1983, reflecting the foregoing transaction and Mr. Dalton Sr.'s assumption of the existing mortgage. The underlying deed was recorded on May 2, 1983, and the Assignment and Assumption Agreement was recorded on August 16, 1985.

Mr. Dalton Sr. acquired lot 5 by deed dated September 24, 1984. The deed to lot 5 and a concomitant mortgage from Mr. Dalton Sr. in favor of the seller were recorded on October 23, 1984.

Creation of J & J Trust

On April 11, 1985, Mr. Dalton Sr. created the J & J Trust. The underlying trust agreement named Mr. Dalton Sr. as grantor and trustee and designated his two grandsons, i.e., petitioners'

---

[2] Although petitioners refer to this conveyance as occurring during April of 1983, the copy of the notarized deed in the record is dated Jan. 13, 1983. The discrepancy is not further elucidated in the record but, in any event, has no material impact on the Court's analysis of the pending motion.

sons Jonathan and Jeremy Dalton, as the beneficiaries.  The trust agreement provided that Mr. Dalton Jr. would have the power to designate and appoint a successor trustee.  Either petitioner could be a trustee.  By deeds likewise dated April 11, 1985, Mr. Dalton Sr. transferred title to lots 3, 4, and 5 to himself as trustee of the J & J Trust.  The deed with respect to lot 3 stated that the premises were conveyed subject to the 1980 mortgage given by petitioners and assumed by Mr. Dalton Sr. pursuant to the 1983 Assignment and Assumption Agreement.  No other consideration was recited.  The three deeds were recorded on August 16, 1985.

Use of Lots 3, 4, and 5

As previously noted, before late 1997 petitioners lived and worked in Massachusetts.  From 1983 through 1990 petitioners operated in Massachusetts a successful equipment business that they sold in 1991.  A significant portion of the sale price was deferred, and the buyer defaulted and ceased making payments sometime during 1992 or 1993.  Petitioners thereafter started a building demolition business, Challenger Construction Corp., working primarily for one or two developers in eastern Massachusetts.  An apparently related corporation, A & M Crane Service, Inc., also seems to have been involved in the business, but the exact nature of the relationship is unclear and petitioners do not necessarily make a distinction between the two.

Also during the early 1990s, petitioners' son Jonathan began a boat and jet-ski rental business in St. Martin, French West Indies. The business was destroyed by a hurricane during the fall of 1993. Jonathan thereafter became a Navy Seal and from that time used the address of the Poland property as his domicile. Jeremy chose a career as an emergency medical technician and resided in Massachusetts, but he also made regular use of the Poland property.

On September 18, 1993, Mr. Dalton Sr., as trustee of the J & J Trust, and Mrs. Dalton executed a $50,000 mortgage in favor of Key Bank of Maine, secured by lots 3 and 4. A $50,000 home equity line of credit, i.e., loan, was thereby obtained. Both individuals signed as "mortgagor", and contractual provisions recited that the mortgagor, inter alia, promised to "lawfully own the Property". Throughout the administrative and judicial processes pertaining to this case, petitioners have maintained and explained that Mrs. Dalton signed the mortgage as a concession to and at the request of the bank, on account of concerns with respect to Mr. Dalton Sr.'s advanced age. The funds were apparently employed by Mr. Dalton Sr. as trustee to assist Jonathan, his grandson and a trust beneficiary, with the Caribbean rental business and/or its aftermath.

There is a house (the residence) on the Poland property which was initially used as the summer home of Mr. Dalton Sr. and his

wife Beatrice Dalton (Mrs. Dalton Sr.) and later became their retirement home.[3] Petitioners and their sons visited Mr. Dalton Jr.'s parents and the Poland property. According to petitioners, the Poland property and attendant mortgages were maintained and supported before mid-1997 by Mr. Dalton Sr. and by contributions from family members, including petitioners, and the trust maintained a separate bank account for such funds.

During 1996 petitioners' demolition business in Massachusetts suffered a reversal. Mr. Dalton Jr. underestimated the cost of performing a large job employing a significant number of people. At the same time, the developer/customer on the project encountered financial difficulty and defaulted on progress payments. Petitioners' corporation(s) failed to pay withholding taxes while awaiting payment, using remaining funds in an effort to keep employees together and complete the job. The developer/customer, however, filed for bankruptcy, and petitioners' corporations were unable to continue business or to pay obligations. Petitioners "lost almost everything" in the collapse when a third-party lender made a claim on a guaranty by petitioners of a working capital loan to Challenger Construction Corp. The claim was settled through the sale of petitioners' home

---

[3] The record on this point is less than entirely clear, but for purposes of this motion for summary judgment, facts are viewed in favor of the nonmoving party. See infra I.A.

in Massachusetts, a sale from which all net proceeds were paid to creditors.

After losing their home in Massachusetts petitioners began living in the residence, sharing occupancy with Mr. Dalton Jr.'s parents. The joint living arrangement was an oral agreement requiring petitioners to manage and maintain the Poland property, pay rent to cover overhead expenses such as mortgage debt service and property taxes, and pay directly their costs of occupancy.

On August 11 and September 29, 1997, the Internal Revenue Service (IRS) recorded assessments against petitioners for trust fund recovery penalties pursuant to section 6672 with respect to employment taxes of Challenger Construction Corp. and A & M Crane Service, Inc., for the June 30 and September 30, 1996, tax periods, respectively. Those assessments totaled $262,163.42.

On September 13, 1999, Mr. Dalton Sr. died. Petitioners continued to live in the residence and to care at the residence for Mrs. Dalton Sr., who suffered from advanced dementia and Alzheimer's disease, until she entered an assisted living facility in 2004. By a document dated June 8, 2000, Mr. Dalton Jr. appointed Mrs. Dalton's brother Robert Pray as successor trustee of the J & J Trust, and Mr. Pray formally accepted that appointment. Mr. Pray resides in Texas. Mr. Pray continued the oral living arrangement that petitioners had with the J & J Trust for the Poland property.

Administrative Proceedings

Meanwhile, on or about December 9, 1999, petitioners submitted to the IRS an offer-in-compromise of $5,000 with respect to, inter alia, the trust fund recovery penalties referenced above. That offer was under consideration until rejected by letter dated August 30, 2001, on the principal ground that an acceptable offer would need to include an alter ego interest in the property of the J & J Trust, for a total offer of at least $240,576. Throughout the process, petitioners sought to supply information and documentation regarding income, expenses, serious health conditions, and lack of employability, and they disputed IRS conclusions with regard to the J & J Trust.

By early to mid-2001, Mr. Dalton Jr. and Mr. Pray had become aware that the J & J Trust had not since its formation filed Federal income tax returns. At that time they met with petitioners' certified public accountant, Thomas B. Anthony, to raise the issue of the J & J Trust's tax returns. After looking into the matter, Mr. Anthony prepared Forms 1041, U.S. Income Tax Return for Estates and Trusts, for the J & J Trust for taxable years 1997 through 2000, a practice that has continued for succeeding years. The returns were filed during or around October of 2001, reporting the rental income from petitioners and various trust expenses.

By letter dated October 1, 2001, petitioners submitted a formal protest of the August 30, 2001, denial of their offer-in-compromise, requesting reconsideration by the IRS Office of Appeals. The requested review commenced, and ongoing communications ensued, including an Appeals hearing on October 23, 2002, with respect to the substance of petitioners' claims. However, in a letter dated March 6, 2003, the IRS Office of Appeals provided written notice that petitioners' offer-in-compromise matter had to be closed. The letter explained that review of administrative files had revealed that petitioners' protest requesting an Appeals hearing had not been filed timely. The matter was effectively dismissed, thereby allowing further collection activity, as appropriate.

On July 2 and 6, 2004, the IRS issued separately to each petitioner a Final Notice of Intent To Levy and Notice of Your Right to a Hearing pertaining to the previously assessed trust fund recovery penalties and accrued interest. The balance due at that time exceeded $400,000. In response petitioners submitted a Form 12153, Request for a Collection Due Process Hearing, expressing their disagreement. An extensive attachment chronicled the history of petitioners' personal circumstances and tax matters, summarizing their present situation as follows:

> Since 1996, the taxpayers have been in contact with the
> IRS regarding the satisfaction of this obligation.
> Mr. Dalton is in his mid 60's. He is totally disabled
> as a result of workplace injuries suffered over time and

resulting arthritis.  Mr. Dalton has suffered cardiac
problems and has undergone open chest by-pass surgery.
Mr. Dalton has limited employment options and has been
unable to work since 2000.  Mrs. Dalton is in her mid-
60's.  Until recently, Mrs. Dalton has been the
caretaker for Mr. Daltons [sic] elderly mother who
suffers from senile dementia and other health problems.
Mrs. Dalton has been and remains unemployable.  The
Daltons have not made enough money in any year since
1999 to require the filing of federal tax returns.
There is no possibility that they will ever be able to
pay the accumulated tax obligation.

The IRS Office of Appeals collection hearing process was conducted through an ongoing exchange of correspondence and telephone calls extending until late September of 2006. Petitioners' objective throughout the process was to establish their entitlement to an offer-in-compromise premised on their circumstances of financial hardship.  The proceeding centered on whether the Poland property held by the J & J Trust should be attributed to petitioners under a nominee theory, as the financial information and documentation petitioners supplied reflected their otherwise very limited resources.  During the process, an advisory opinion was sought and obtained from the IRS Office of Chief Counsel on the applicability of alter ego or nominee principles to petitioners' situation.  That opinion considered various factors derived from Federal caselaw and concluded that a nominee relationship did exist between petitioners and the J & J Trust.  The document also included a paragraph opining that a reachable interest in trust real estate could be asserted against petitioners under a lien tracing theory,

on the basis of their use of funds for mortgage payments, taxes, and other property expenses.

During consideration of their case petitioners suggested the filing of a $10,000 offer-in-compromise, on the basis of the amount that they believed they could borrow from their sons. No such offer was submitted, however, after Appeals personnel advised that because the amount would not be acceptable, filing on the basis of that amount would be "futile", given the trust interest.

On October 24, 2006, the IRS Office of Appeals issued to each petitioner the separate Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 underlying this proceeding. In those notices the IRS sustained levy action on the ground that no acceptable collection alternatives had been submitted. Attachments to the notices focused on, and explained the determinations in terms of, the need for any collection alternative to incorporate equity in real estate held by a trust with respect to which petitioners stood in a nominee relationship. No mention was made of the lien tracing theory.

## Discussion

### I. General Rules

#### A. Summary Judgment

Rule 121(a) allows a party to move "for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy." Rule 121(b) directs that a

decision on such a motion shall be rendered "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law."

The moving party bears the burden of demonstrating that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994). Facts are viewed in the light most favorable to the nonmoving party. Id. However, where a motion for summary judgment properly has been made and supported, the opposing party may not rest upon mere allegations or denials contained in that party's pleadings but must by affidavits or otherwise set forth specific facts showing that there is a genuine issue for trial. Rule 121(d).

B.  Collection Actions

As a general rule, section 6331(a) authorizes the Commissioner to levy upon all property and rights to property of a person where there exists a failure on the part of such person to pay any tax liability within 10 days after notice and demand for payment.  Sections 6331(d) and 6330 set forth procedures generally applicable to afford protections for persons in such levy situations.  Section 6331(d) establishes the requirement that the

person be provided with at least 30 days' prior written notice of the Commissioner's intent to levy before collection may proceed. Section 6330(a) forbids collection by levy until the person has received notice of the opportunity for administrative review of the matter in the form of a hearing before the IRS Office of Appeals.  Section 6330(b) grants a person who makes such a request the right to a fair hearing before an impartial Appeals officer.

Section 6330(c) addresses the matters to be considered at the hearing:

> SEC. 6330(c).  Matters Considered at Hearing.--In the case of any hearing conducted under this section--
>
> (1) Requirement of investigation.--The appeals officer shall at the hearing obtain verification from the Secretary that the requirements of any applicable law or administrative procedure have been met.
>
> (2) Issues at hearing.--
>
> (A) In general.--The person may raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy, including--
>
> (i) appropriate spousal defenses;
>
> (ii) challenges to the appropriateness of collection actions; and
>
> (iii) offers of collection alternatives, which may include the posting of a bond, the substitution of other assets, an installment agreement, or an offer-in-compromise.
>
> (B) Underlying liability.--The person may also raise at the hearing challenges to the existence or amount of the underlying tax

liability for any tax period if the person did not receive any statutory notice of deficiency for such tax liability or did not otherwise have an opportunity to dispute such tax liability.

Once the Appeals officer has issued a determination regarding the disputed collection action, section 6330(d) allows the person to seek review in the Tax Court.[4]  In considering any relief from the Commissioner's determination to which the person may be entitled, this Court has established the following standard of review:

where the validity of the underlying tax liability is properly at issue, the Court will review the matter on a de novo basis.  However, where the validity of the underlying tax liability is not properly at issue, the Court will review the Commissioner's administrative determination for abuse of discretion. [Sego v. Commissioner, 114 T.C. 604, 610 (2000).]

C.  Offers-in-Compromise

Section 7122(a), as pertinent here, authorizes the Commissioner to compromise any civil case arising under the internal revenue laws.  Regulations promulgated under section 7122 set forth three grounds for compromise of a liability:  (1) Doubt as to liability, (2) doubt as to collectibility, or (3) promotion of effective tax administration.  Sec. 301.7122-1(b), Proced. & Admin. Regs.  With respect to the third-listed ground, a

---

[4] The Pension Protection Act of 2006, Pub. L. 109-280, sec. 855, 120 Stat. 1019, amended sec. 6330(d)(1) to provide that for determinations made after Oct. 16, 2006, the Tax Court has jurisdiction to review the Commissioner's collection activity regardless of the type of underlying tax involved.

compromise may be entered to promote effective tax administration where: (1)(a) Collection of the full liability would cause economic hardship; or (b) exceptional circumstances exist such that collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner; and (2) compromise will not undermine compliance by taxpayers with the tax laws. Sec. 301.7122-1(b)(3), Proced. & Admin. Regs.

D. Nominee Principles

As noted above, section 6331(a) generally authorizes collection of tax by levy against "all property and rights to property" belonging to a person liable for the tax or on which there is a lien for the payment of such tax. It is well settled that the foregoing provision "'is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have.'" Drye v. United States, 528 U.S. 49, 56 (1999) (quoting United States v. Natl. Bank of Commerce, 472 U.S. 713, 719-720 (1985)). Such a lien or levy reaches, inter alia, to property held by a third party if that third party is holding the property as a nominee or alter ego of the delinquent person. G.M. Leasing Corp. v. United States, 429 U.S. 338, 350-351 (1977); Holman v. United States, 505 F.3d 1060, 1065 (10th Cir. 2007); Spotts v. United States, 429 F.3d 248, 251 (6th Cir. 2005).

However, because the Federal levy statute "'creates no property rights but merely attaches consequences, federally defined, to rights created under state law'", applicability of nominee principles to support levy turns on a two-part inquiry. United States v. Natl. Bank of Commerce, supra at 722 (quoting United States v. Bess, 357 U.S. 51, 55 (1958)); see also Drye v. United States, supra at 58 ("We look initially to state law to determine what rights the * * * [person] has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation."); Holman v. Commissioner, supra at 1067; Spotts v. United States, supra at 251.

The first question is whether under State law the person held an interest or rights in the property sought to be reached. Holman v. Commissioner, supra at 1067-1068; Spotts v. United States, supra at 251; May v. A Parcel of Land, 458 F. Supp. 2d 1324, 1334-1335 (S.D. Ala. 2006), affd. sub nom. May v. United States, 100 AFTR 2d 2007-6602, 2007-2 USTC par. 50,799 (11th Cir. 2007); United States v. Krause, 386 Bankr. 785, 831 (Bankr. D. Kan. 2008). Upon an affirmative answer, the evaluation proceeds to the second question of whether the IRS may reach the interest under Federal nominee principles. Holman v. Commissioner, supra

at 1067-1068; <u>Spotts v. United States</u>, <u>supra</u> at 251; <u>May v. A Parcel of Land</u>, <u>supra</u> at 1334-1335; <u>United States v. Krause</u>, <u>supra</u> at 831.

For purposes of the second inquiry, a relatively well-defined body of Federal common law has evolved.  Case jurisprudence has established a series of factors considered in determining whether an existing beneficial interest in property is reachable to satisfy Federal tax liabilities under the theory that the property is held by a nominee of the delinquent taxpayer.  Commonly cited criteria include:  (1) Whether no consideration or inadequate consideration was paid by the nominee for the property and/or whether the taxpayer expended personal funds for the nominee's acquisition; (2) whether property was placed in the nominee's name in anticipation of a suit or the occurrence of liabilities; (3) whether a close personal or family relationship existed between the taxpayer and the nominee; (4) whether the conveyance of the property was recorded; (5) whether the taxpayer retained possession of, continued to enjoy the benefits of, and/or otherwise treated as his or her own the transferred property; (6) whether the taxpayer after the transfer paid costs related to maintenance of the property (such as insurance, tax, or mortgage payments); (7) whether, in the case of a trust, there were sufficient internal controls in place with respect to the management of the trust; and (8) whether, in the

case of a trust, trust assets were used to pay the taxpayer's personal expenses. E.g., Holman v. Commissioner, supra at 1065 n.1; Spotts v. United States, supra at 253 n.2; Loving Saviour Church v. United States, 728 F.2d 1085, 1086 (8th Cir. 1984); May v. A Parcel of Land, supra at 1338; United States v. Dawes, 344 F. Supp. 2d 715, 721 (D. Kan. 2004), affd. 161 Fed. Appx. 742 (10th Cir. 2005); United States v. Krause, supra at 831. In examining the delineated factors, the overarching issue is whether and to what degree the person generally exercises control over the nominee and assets held thereby. E.g., May v. A Parcel of Land, supra at 1338 (and cases cited thereat). As phrased in one recent case: "The ultimate inquiry is whether the * * * [person] has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership." Holman v. United States, supra at 1065.

With respect to the first inquiry, i.e., the State law question, recent cases have clarified the centrality of finding a State law interest as a condition precedent. Holman v. Commissioner, supra at 1067, 1070 (vacating and remanding a case seeking to enforce a nominee tax lien for the IRS first to establish that the person held a beneficial interest in the property under State law); Spotts v. United States, supra at 251, 253-254 (vacating and remanding a grant of summary judgment for

the IRS in a case seeking removal of a nominee lien because the lower court did not first consider whether the person had a beneficial interest under State law); May v. A Parcel of Land, supra at 1334-1335; United States v. Krause, supra at 831. In that connection, various theories have been used to support the existence of an interest under State law, depending upon the jurisdiction and particular facts involved. Examples include resulting trust doctrines, constructive trust principles, fraudulent conveyance standards, and concepts drawn from State jurisprudence on piercing the corporate veil. See, e.g., Holman v. Commissioner, supra at 1068 (and cases cited thereat); Spotts v. United States, supra at 252-253; Criner v. Commissioner, T.C. Memo. 2003-328; United States v. Evseroff, 92 AFTR 2d 2003-6987 (E.D.N.Y. 2003) (and cases cited therein); United States v. Krause, supra at 831 (and cases cited thereat).

II. Analysis

Petitioners have not at any time throughout the administrative or judicial proceedings attempted to challenge their underlying tax liabilities; i.e., the trust fund recovery penalties. Accordingly, we decide respondent's motion for summary judgment on the basis of whether respondent, as the moving party, has proved that respondent's Office of Appeals did not abuse its discretion in determining to proceed with collection

and failing to accept petitioners' offer-in-compromise because it did not take into account a nominee interest allegedly held by petitioners. Action constitutes an abuse of discretion where the action is arbitrary, capricious, or without sound basis in fact or law. Olsen v. United States, 414 F.3d 144, 150 (1st Cir. 2005); Woodral v. Commissioner, 112 T.C. 19, 23 (1999). Thus, resolution of the instant motion will turn on whether, as a matter of law, respondent has proved that respondent's Office of Appeals did not abuse its discretion in determining that petitioners held a nominee interest in the J & J Trust and in determining that the value of the Poland property must be incorporated in any offer-in-compromise. Before turning to that question, however, the Court will briefly address two preliminary matters raised by the parties' submissions.

First, although those submissions are not well developed on the point, the parties appear to advance conflicting views with respect to the contours of the proper record for review and which party is attempting to exceed the bounds of the record. The basis for the Court's ruling below, however, renders it unnecessary to probe any such claims at this juncture.

Similarly, in the instant motion, respondent asserts two alternative grounds for determining that any offer-in-compromise would need to incorporate the value of the Poland property. Respondent advances the nominee theory at some length, then

briefly resurrects the lien tracing theory.  Nonetheless, the record of the hearing in respondent's Office of Appeals, however construed, would seem to suggest that the alternative lien tracing theory was not pursued by respondent's Office of Appeals and did not form a basis for the discretion exercised in upholding the collection action.  Entries in respondent's Office of Appeals case activity records chronicle the deliberative process transpiring after receipt of the advisory opinion from the IRS Office of Chief Counsel and note that after review of the opinion and "independent review of the facts", the reviewing officer "would concur that there is a nominee issue".  The notes then go on to discuss the nominee factors and the manner in which the officer's conclusions on the nominee issue were communicated to petitioners' representative.  In stark contrast stands the situation with respect to the lien tracing theory.  The advisory opinion stated, concerning the lien tracing approach, that a transferee lien would exist against the real estate "to the extent of the mortgage payments and other expenses paid by the Taxpayers."  Yet the record is devoid of any indication that respondent's Office of Appeals attempted to quantify those payments or the resultant equity as a basis for deeming $10,000 an insufficient offer, as well as any meaningful analysis of other legal requirements for the lien tracing approach.  The notices of determination and attachments are similarly silent as to any lien tracing theory but

state that "thorough, independent analysis of the facts and circumstances as presented reveals that there is a nominee relationship that exists and that the equity in said real estate needs to be considered", with the discussions following that statement highlighting the nominee factors. Consequently, on the present record, respondent's Office of Appeals would seem never to have carried out the requisite analysis that would support application of lien tracing and may have exercised any discretion in that connection to decline pursuit of the tracing approach. Regardless, however, of what transpired administratively, it is sufficient for the purposes of the instant motion to note that the facts pertaining to the lien tracing theory have not been developed to a point where we could grant summary judgment for respondent in that respect. Accordingly, we return to our discussion of the nominee issue.

In moving for summary judgment respondent argues that the administrative record "not only completely discloses all of the factors that * * * [respondent's Office of Appeals] considered in making * * * [its] determination but also confirms that * * * [it] did not omit any relevant factor required to make such determination." Respondent then sets forth the factors derived from Federal caselaw for evaluating nominee status and summarizes the findings of respondent's Office of Appeals with respect to those criteria. The underlying record of the hearing at

respondent's Office of Appeals supports that respondent's determinations were based on application of the Federal nominee factors.

While we do not disagree with respondent's premise that the Federal inquiry is a critical component in a nominee analysis, we are unable to agree with respondent's determinations because it appears that respondent failed to make the State law inquiry. There is no indication in the record that respondent's Office of Appeals made any attempt to assess the preliminary requisite that petitioners have an interest in the Poland property under State law. Maine law is nowhere mentioned in the determinations by respondent's Appeals officer.

Hence, we are unable to conclude, on the basis of the instant record, that respondent's Office of Appeals committed no abuse of discretion in determining that petitioners held an interest in the Maine property reachable by respondent under a nominee theory. In general, courts hold that an abuse of discretion occurs if a decisionmaker's ruling is based on an erroneous view of the law. See, e.g., Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402 (1990); Abrams v. Interco, Inc., 719 F.2d 23, 28 (2d Cir. 1983); Freije v. Commissioner, 125 T.C. 14, 36-37 (2005); Kendricks v. Commissioner, 124 T.C. 69, 75 (2005); Swanson v. Commissioner, 121 T.C. 111, 119 (2003). As previously observed by this Court in the section 6330 context: "Whether

characterized as a review for abuse of discretion or as a consideration 'de novo' (of a question of law), we must reject erroneous views of the law." Kendricks v. Commissioner, supra at 75.

With respect to the instant motion, the record fails to establish that respondent's Office of Appeals applied or even considered the correct standard in evaluating petitioners' interest in the Maine property. We are unable to conclude, on the basis of the instant record, whether respondent made the requisite State law inquiry in order to reach respondent's determinations that petitioners held a nominee interest in the Poland property.

On the basis of the foregoing, respondent's motion for summary judgment will be denied. We will remand the instant case to respondent's Office of Appeals in order for that office to create a proper record as to whether asserting an interest in the Poland property is proper, taking into account both a State law inquiry and a Federal factors analysis.

To reflect the foregoing,

An appropriate order denying respondent's motion and remanding the case will be issued.