# United States Court of Appeals
## For the First Circuit

———————

No. 11-2217

ARTHUR DALTON, JR., AND BEVERLY DALTON,

Petitioners, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent, Appellant.

———————

APPEAL FROM THE UNITED STATES TAX COURT

[Hon. Thomas B. Wells, Judge]

———————

Before

Lynch, Chief Judge,
Selya and Boudin, Circuit Judges.

———————

Bethany B. Hauser, Attorney, Tax Division, with whom Tamara W. Ashford, Deputy Assistant Attorney General, and Thomas J. Clark, Attorney, Tax Division, U.S. Department of Justice, were on brief, for appellant.
John W. Geismar, with whom Daniel L. Cummings and Norman, Hanson & DeTroy, LLC were on brief, for appellees.

———————

June 20, 2012

———————

**SELYA, Circuit Judge.** This appeal turns primarily on the standard of review that courts should apply when examining conclusions reached by the Internal Revenue Service (IRS) following a collection due process (CDP) hearing. See 26 U.S.C. § 6330(b). While courts generally have agreed that review in this context is for abuse of discretion, no court has had the occasion to parse that standard and analyze how it plays out with respect to subsidiary factual and legal determinations made by the IRS during the CDP process. We grapple with that issue today.

The issue arises in a case in which the taxpayers offered to settle their tax liability for pennies on the dollar. The IRS determined that the taxpayers could afford to pay more because they owned valuable real estate and, therefore, rejected the offer in compromise. In a first-tier appeal, the Tax Court reviewed the IRS's underlying ownership determination de novo, found that the taxpayers were not the owners of the real estate in question, and directed the IRS to accept the offer in compromise. It later ordered the IRS to pay attorneys' fees to the taxpayers as prevailing parties.

We hold that the Tax Court employed an improper standard of review with respect to the IRS's subsidiary determinations. Applying a more deferential standard to these determinations consistent with the nature and purpose of the CDP process, we conclude that the IRS did not abuse its discretion when it rejected

-2-

the taxpayers' offer in compromise. The IRS acted reasonably in determining that the taxpayers were the owners of the property and, thus, the equity in the property was appropriately considered when the IRS evaluated the compromise offer. Consequently, we reverse the Tax Court's judgment.

## I. BACKGROUND

The taxpayers are a married couple: Arthur Dalton, Jr., and Beverly Dalton. In 1977 and 1980, respectively, they purchased two adjacent lots abutting Thompson Lake in Poland, Maine. In 1983, they deeded both lots, subject to an existing mortgage, to Arthur Dalton, Sr. (the father of Arthur Dalton, Jr.) for $1. Although the grantee agreed to assume the mortgage, the record contains no evidence that the mortgagee released the taxpayers from liability.

In 1984, Arthur Dalton, Sr., purchased an abutting lot. He then deeded all three lots (the Property) to a grantor trust of his creation. He appointed himself as the sole trustee, specified that the trust would expire upon the death of the last survivor of himself and the taxpayers, and designated the taxpayers' children as the trust's beneficiaries.

Notwithstanding these maneuvers, the record contains substantial evidence suggesting that the taxpayers continued to treat the Property as their own. For one thing, they continued to pay for the maintenance and upkeep of the Property. For another

-3-

thing, long after the trust had taken title, Beverly Dalton co-signed a new mortgage on the Property and, in the mortgage papers, represented herself to be an owner of the Property.[1]

The Property contains a large house, and the taxpayers moved into the house in 1997. The impetus for the move was the failure of their business and the consequent loss of their Massachusetts home. The Property has remained their principal residence since that time. The taxpayers have never had a written lease, but they insist that they entered into an oral lease with the trustee. They assert that under the terms of the oral lease, they agreed to care for the trustee's elderly wife, manage and maintain the Property, and pay "rent" roughly equal to the amount needed to defray mortgage payments and real estate taxes.

Arthur Dalton, Sr., passed away in 1999. The trust indenture gave Arthur Dalton, Jr., the power to name a successor trustee. He appointed Robert Pray (Beverly Dalton's brother). The widow of Arthur Dalton, Sr., entered an assisted-living facility a few years later. Since then, the taxpayers have been the sole inhabitants of the Property. They continue to maintain the premises and supply funds to the trust sufficient to cover the mortgage payments and real estate taxes. Beverly Dalton, who has

---

[1] In the CDP proceedings, Beverly Dalton claimed to have co-signed the mortgage as an "accommodation" to the mortgagee. She also asserted that the mortgagee knew that she did not own the Property.

the power to sign checks written on the trust's account, ensures that mortgage and tax payments are kept current.

The record also indicates that the trustees and the taxpayers have been less than scrupulous in observing certain formalities. To cite one example, the trust did not file any tax returns until 2001 (after the present controversy with the IRS was under way). To cite another example, the mortgagee, Key Bank, has since 2000 forwarded paperwork to Arthur Dalton, Jr., indicating that he is the payor of the mortgage and, thus, the person eligible to take the concomitant interest deduction for tax purposes.

In 2001, the taxpayers refinanced the mortgage. The bank's records anent the new mortgage list the taxpayers as the owners of the Property.

The current trustee, Pray, lives in Texas but insists that he controls the trust corpus. He claims that he speaks to the taxpayers three to four times per year regarding the Property and that he visits annually to ensure its condition. He has kept no records (or even notes) commemorating any of these meetings or discussions.

The taxpayers' troubles with the IRS began just before their business went bankrupt. The taxpayers owned and operated Challenger Construction Corp., which in 1996 withheld payroll taxes but never paid the retained amounts to the United States. The IRS determined that the taxpayers were personally liable for those

-5-

amounts.  See 26 U.S.C. § 6672(a); Jean v. United States, 396 F.3d 449, 453-54 (1st Cir. 2005).  With accrued interest, the taxpayers' alleged indebtedness now exceeds $400,000.

In 2004 — perhaps eyeing the taxpayers' equity in the Property — the IRS gave notice of its intent to levy.  See 26 U.S.C. § 6330(a).  The taxpayers did not dispute the amount of taxes owed but, rather, requested a pre-attachment CDP hearing and offered to settle their debt for a total of $10,000.  See id. § 6330(b), (c)(2)(A)(iii).  They denied that they had any ownership interest in the Property and asserted that, based on their assets and income, they could never come close to satisfying their total tax liability.

After gathering information from the taxpayers and hearing their arguments, the IRS rejected the offer in compromise.[2] In reaching this decision, the IRS applied principles gleaned from federal case law and found that the taxpayers were the real owners of the Property; that is, that the trust was merely a nominee for the taxpayers and held naked legal title purely for their convenience.  Relying on this finding, the IRS concluded that the offer in compromise was insufficient because the taxpayers'

---

[2] The decision to reject the offer was made by an appeals officer.  For ease in exposition, we attribute actions of specific IRS employees to the agency itself.

ownership interest in the Property could be liquidated to generate substantially more funds.[3]

The taxpayers appealed, and the Tax Court directed the IRS to reconsider the nominee issue in light of Maine law. See Dalton v. Comm'r, 96 T.C.M. (CCH) 3 (2008). On remand, the IRS concluded that a Maine court likely would borrow nominee principles from federal law and reiterated its finding that the trust was a mere nominee. Accordingly, the IRS stood by its rejection of the offer in compromise.

The taxpayers again repaired to the Tax Court. Reviewing the IRS's ownership finding de novo, the court determined that the trust was not a nominee of the taxpayers under Maine law. Dalton v. Comm'r, 135 T.C. 393, 407-15 (2010). The court added that federal law would dictate the same result. Id. at 415-23. Accordingly, the IRS had abused its discretion in rejecting the taxpayers' offer because the IRS had premised that rejection on an erroneous view of the law. Id. at 423-24. To add insult to injury, the court thereafter awarded attorneys' fees to the taxpayers on the ground that the IRS was not substantially justified in rejecting the offer. Dalton v. Comm'r, 101 T.C.M. (CCH) 1653 (2011) (citing 26 U.S.C. § 7430). This timely second-tier appeal ensued.

---

[3] The record indicates that the Property is likely worth far more than the amount outstanding on the mortgage encumbrances.

## II. ANALYSIS

We begin our analysis by identifying the applicable standards of review. We then proceed to discuss the merits of the Tax Court's rulings.

### A. Standards of Review.

Where, as here, the amount of the underlying tax liability is not in dispute, we review the IRS's disposition of an offer in compromise following a CDP hearing for abuse of discretion, ceding no special deference to the Tax Court's intermediate review. See Murphy v. Comm'r, 469 F.3d 27, 32 (1st Cir. 2006); Olsen v. United States, 414 F.3d 144, 150 (1st Cir. 2005); see also H.R. Rep. No. 105-599, at 266 (1998). The parties agree with this paradigm. They disagree, however, as to how a court should review the preludial findings on which the IRS bases its rejection of an offer in compromise.

The taxpayers argue that any finding predicated on a material error of law is a per se abuse of discretion. See, e.g., United States v. Walker, 665 F.3d 212, 223 (1st Cir. 2011). This means, they say, that any abstract legal question that formed a part of the IRS's decisional calculus must be accorded de novo review. The IRS argues for a more deferential standard.

In the exercise of powers of judicial review, one size does not fit all. The taxpayers' construct — that questions of law engender de novo review even when a matter is committed to a lower

-8-

court's (or an agency's) discretion, see, e.g., R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 7-8 (1st Cir. 2009) — can usefully be applied in many contexts. But the taxpayers' attempt to impose that construct across the board overlooks the peculiar nature of the CDP process. As we explain below, a court's role in the CDP process is simply to confirm that the IRS did not abuse its wide discretion and — as part and parcel of that inquiry — to ensure that the agency's subsidiary factual and legal determinations were reasonable.

The appropriate conception of the standard of review for CDP cases flows naturally from the history and structure of the legislation that created the CDP process. Congress inaugurated this process in 1998 as part of a legislatively crafted "Taxpayer Bill of Rights." See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, §§ 3000, 3401, 112 Stat. 685, 726, 746. Prior to that time, the IRS could reach a delinquent taxpayer's assets by lien or levy without providing any sort of pre-attachment process. See Phillips v. Comm'r, 283 U.S. 589, 593-97 (1931). This one-sided model created a potential for abuse. Congress recognized this risk, and its goal in establishing the CDP process was to safeguard taxpayers by affording them a pre-deprivation opportunity to ward off harassment and to avoid groundless attachments. See Olsen, 414 F.3d at 150; Living Care

-9-

Alts. of Utica, Inc. v. United States, 411 F.3d 621, 629, 631 (6th Cir. 2005).

The CDP process has its own standards: there is no obligation to conduct a face-to-face hearing, no formal discovery, no requirement for either testimony or cross-examination, and no transcript. See Living Care, 411 F.3d at 624, 629; Treas. Reg. § 301.6330-1(d)(2), Q&A D6. Rather, the "hearing" typically comprises informal oral and written communications between the IRS and the taxpayer. See Treas. Reg. § 301.6330-1(d)(2), Q&A D6. Following this exchange of information, which may include the making of an offer in compromise, the IRS is tasked with deciding whether it is reasonable to proceed with its intended collection action. See 26 U.S.C. § 6330(c); Olsen, 414 F.3d at 150; Living Care, 411 F.3d at 625.

To be sure, Congress did not give the IRS the final say in the CDP process. Instead, it provided for judicial review of the IRS's determinations. See 26 U.S.C. § 6330(d)(1). But Congress must have intended this direction for judicial review to operate in light of the CDP process itself; and given the limited scope of the CDP process and the "scant record" that it customarily generates, Olsen, 414 F.3d at 150, a court cannot be expected to conduct the same level of judicial review that would follow, say, a bench trial or a more formal agency proceeding. See Living Care, 411 F.3d at 625.

We conclude, therefore, that judicial review must be tailored to effecting the purpose of the CDP process; that is, to ensuring that the IRS's determinations, whether of fact or of law, are not arbitrary. See Murphy, 469 F.3d at 32; Christopher Cross, Inc. v. United States, 461 F.3d 610, 612 (5th Cir. 2006); Robinette v. Comm'r, 439 F.3d 455, 459 (8th Cir. 2006); Olsen, 414 F.3d at 150; Living Care, 411 F.3d at 631. Thus, a court should set aside determinations reached by the IRS during the CDP process only if they are unreasonable in light of the record compiled before the agency. See Murphy, 469 F.3d at 33 (finding no abuse of discretion when the IRS reached a reasonable conclusion regarding a taxpayer's ability to pay and, accordingly, rejected an offer in compromise). Any more intrusive standard of review would result in the courts "inevitably becom[ing] involved on a daily basis with tax enforcement details that judges are neither qualified, nor have the time, to administer." Olsen, 414 F.3d at 150 (quoting Living Care, 411 F.3d at 631) (internal quotation marks omitted).

This case illustrates both the wisdom and the utility of the custom-tailored standard of review that should accompany appeals from CDP dispositions. The pivotal question in connection with the appropriateness of the taxpayers' offer in compromise relates to the actual ownership of the Property. Especially when a claim is made that one party is a nominee for another, such questions are notoriously fact-intensive. Oxford Capital Corp. v.

-11-

<u>United States</u>, 211 F.3d 280, 284 (5th Cir. 2000) (per curiam). The CDP process neither allows for discovery, nor does it bring before the IRS all of the parties in interest — the trust, which holds record title to the Property, is conspicuously absent. And even though the IRS had the benefit of some documentary evidence and a few affidavits, it could not cross-examine any of the affiants, compel production of other relevant documents, or subpoena third parties. <u>See</u> Treas. Reg. §§ 301.6330-1(d)(2), Q&A D6, 601.106(c). These circumstances make it almost certain that not all of the facts that will ultimately inform the determination of who actually owns the Property were before the IRS.

Congress knew about the incomplete nature of the record that would be available to the IRS during the CDP process, and, thus, Congress must have known that it would make little sense for a court to undertake de novo review of subsidiary determinations made during that process. <u>See</u> <u>Olsen</u>, 414 F.3d at 150; <u>Living Care</u>, 411 F.3d at 625. The more sensible course — and the one that we are confident that Congress envisioned — is for a reviewing court to consider whether the factual and legal conclusions reached at a CDP hearing are reasonable, not whether they are correct.

This case is a poster child for the reasonableness standard. Were we to decide definitively who owns the Property, we would be adjudicating the rights of a third party (the trust) that has had no opportunity to be heard. The trust would not be bound

-12-

by our decision, see Cruz v. Melecio, 204 F.3d 14, 19 (1st Cir. 2000), and it could relitigate the ownership issue in an independent proceeding. Such a duplication of effort would both undermine the significant public interest in the speedy and efficient resolution of disputes and open the door to inconsistent decisions. See Z & B Enters., Inc. v. Tastee-Freez Int'l, Inc., 162 F. App'x 16, 21 (1st Cir. 2006). That would, in turn, cast a shadow over the integrity of the judicial system. See Montana v. United States, 440 U.S. 147, 153-54 (1979).

De novo review would also give the taxpayers two bites at the cherry. For example, were we to rule that the trust is the real owner of the Property, the taxpayers would carry the day. If, however, we were to rule that the taxpayers are the real owners, the Commissioner in all likelihood would have to relitigate the point in a separate proceeding to which the trust is a party. The need for relitigation would, in effect, create a second opportunity for the taxpayers to dispute ownership. We do not think that Congress could have intended so curious a result.

In sum, a court's job is not to review the IRS's CDP determinations afresh. Rather, its job is twofold: to decide whether the IRS's subsidiary factual and legal determinations are

reasonable and whether the ultimate outcome of the CDP proceeding constitutes an abuse of the IRS's wide discretion.[4]

## B. **The CDP Hearing.**

We turn next to the reasonableness of the IRS's subsidiary determinations and the appropriateness of its ultimate decision. We start with some background.

There are three sets of circumstances that may induce the IRS to accept a taxpayer's offer in compromise following a CDP hearing. These include doubt about the taxpayer's liability, doubt about the collectability of the tax indebtedness, or a finding that the proffered compromise would promote effective tax administration. Treas. Reg. § 301.7122-1(b). In this case, the taxpayers say that doubts about collectability should have prompted the IRS to accept their settlement offer. Cf. John Heywood, Dialogue Prouerbes Eng. Tongue (1546) (explaining that "[f]or better is half a loaf than no bread").

The IRS does not abuse its discretion when it rejects an offer in compromise premised on doubts about collectability as long as it reasonably determines that more than the proferred amount may

_____

[4] This deferential standard of review by no means leaves a taxpayer at the mercy of the IRS. There are almost always other legal channels through which a taxpayer may develop a complete record and secure a definitive legal ruling on a contested point of law or fact. Here, for instance, if the IRS attaches the Property, the taxpayers can attempt to secure a court order dissolving the attachment. By the same token, the trust can bring either a wrongful levy action or a suit to quiet title.

-14-

be collectable.  See Murphy, 469 F.3d at 33.  The IRS rejected the taxpayers' proferred compromise because it concluded that their perceived ownership interest in the Property represented a significant source of additional funds.  We explain briefly why we do not think that the IRS abused its discretion in formulating this rationale.

The IRS has broad powers to levy against "property and rights to property" belonging to taxpayers in order to collect delinquent debts.  26 U.S.C. § 6331(a).  An ownership interest in land is attachable property within the meaning of the levy statute.  See G.M. Leasing Corp. v. United States, 429 U.S. 338, 349-50 (1977).  Here, however, the taxpayers assert that they have no ownership interest in the Property.  Whether a particular asset belongs to a taxpayer is a question of state law.  See Drye v. United States, 528 U.S. 49, 58 (1999).  In the case at hand, Maine law provides the substantive rules of decision.  See Sunderland v. United States, 266 U.S. 226, 232-33 (1924).

In connection with real property, Maine recognizes the nominee doctrine.  See Atkins v. Atkins, 376 A.2d 856, 859 (Me. 1977).  This doctrine allows for the possibility that the true owner of a parcel of land may be someone other than the record owner.  See id.; see also Holman v. United States, 505 F.3d 1060, 1065 (10th Cir. 2007); William D. Elliott, Federal Tax Collections, Liens, and Levies, at 9-93 to 9-94 (2d ed. 2008).  The IRS argues

that this doctrine applies here because the trust holds title to the Property as a proxy for the taxpayers. The taxpayers argue that the nominee doctrine is not applicable because the trust owns the Property in its own right.

Maine case law does not fully delineate the contours of the nominee doctrine. The only decision on point is Atkins, in which the Maine Supreme Judicial Court (the Law Court) mentioned three factors that may tend to indicate the existence of a nominee relationship. See 376 A.2d at 859. Atkins, however, does not aspire to spell out the totality of the nominee inquiry. Given this dearth of precedent, the IRS looked elsewhere for guidance as to how the Maine courts might flesh out the nominee doctrine. This entailed canvassing cases from other jurisdictions (primarily federal cases).

It is not our role, as a court reviewing findings made in the course of a CDP hearing, to determine whether the IRS applied the correct rule of law. In the last analysis, we need only determine whether the IRS applied a reasonable view of what the law is or might be. In this instance, we believe that the IRS acted reasonably in looking to case law from other jurisdictions to fill the void and illuminate Maine's nominee doctrine. Cf. Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51-52 (1st Cir. 2008) (explaining that a federal court tasked to determine state law in a diversity case and finding no controlling

-16-

decision may consider, among other things, "precedents in other jurisdictions").

The taxpayers suggest that Maine cases discussing fraudulent conveyance, constructive trust, and resulting trust would have better informed the IRS's nominee inquiry. This case law might have been helpful if the IRS's theory were that the taxpayers either had conveyed the Property for the purpose of avoiding their tax liability, see Me. Rev. Stat. tit. 14, §§ 3571-3582 (Uniform Fraudulent Transfer Act), or had abused a confidential relationship in order unjustly to retain an interest in the Property, see Christman v. Parrotta, 361 A.2d 921, 925 (Me. 1976). But the IRS's theory is of a different character; it posits that, given the taxpayers' dominion over the Property, they should be treated as the real owners. This difference renders inapposite the cases on which the taxpayers rely. See Oxford Capital, 211 F.3d at 284 (explaining that the nominee doctrine differs from other ownership theories and provides an "independent bas[i]s for attaching the property of a third party in satisfaction of a delinquent taxpayer's liability").

Almost universally, courts weigh the existence of a nominee relationship by balancing a series of factors, including but not limited to whether the consideration paid by the putative nominee was adequate, whether the property was transferred in anticipation of liability, whether a close relationship exists

between the transferor and putative nominee, whether the transferor retains possession and/or use of the property notwithstanding the transfer, and whether the transferor continues to enjoy the benefits of the property. See, e.g., Holman, 505 F.3d at 1065 n.1; Spotts v. United States, 429 F.3d 248, 253 n.2 (6th Cir. 2005); Oxford Capital, 211 F.3d at 284 n.1. Courts also have viewed as relevant whether the transferor furnishes the funds used to purchase the property, whether the transferor is providing the wherewithal needed to maintain the property post-transfer, and whether the transferor continues to treat the property as his own. See United States v. Callahan (In re Callahan), 442 B.R. 1, 6 n.5 (D. Mass. 2010); Richards v. United States (In re Richards), 231 B.R. 571, 579 (E.D. Pa. 1999). Virtually without exception, courts focus on the totality of the circumstances without regarding any single factor as the sine qua non of a nominee relationship. See Elliott, supra, at 9-95.

Viewed against this backdrop, the IRS's decision to apply a balancing test to resolve the nominee question appears reasonable. Atkins bolsters this conclusion. There, the Law Court deemed as indicative of a nominee relationship three of the factors commonly weighed in the balancing test. See Atkins, 376 A.2d at 859 (noting that transferor had furnished down payment, claimed depreciation for tax purposes, and continued to pay taxes and insurance).

The IRS's execution of the balancing test was equally reasonable. Numerous circumstances in this case point unerringly to the existence of a nominee relationship. The taxpayers "sold" the major part of the Property to the grantor of the trust for nominal consideration ($1); they nonetheless continue to enjoy sole possession of the Property; they alone are responsible for the Property's maintenance and upkeep; they defray all mortgage payments and real estate taxes and pay no rent as such; they have from time to time continued to hold themselves out as owners; and the beneficiaries of the trust are the taxpayers' children. What is more, one of the taxpayers hand-picked the present trustee (who is a sibling of the other taxpayer); the taxpayers and the trust have no written lease or other documentation of their asserted relationship; and the trust itself habitually has operated with minimal attention to records or other indicia of independent existence. These and other undisputed facts are sufficient to ground a reasonable inference that the trust is nothing more than a proxy for the taxpayers.

We do not gainsay that there are some facts that point in the opposite direction. But the existence of these contradictory facts is not enough to tip the scales in a reasonableness analysis. After all, the question is not the correctness vel non of the IRS's determination that the taxpayers actually own the Property. Rather, the question is whether the IRS's determination, correct or

not, falls within the wide universe of reasonable outcomes. Because the evidence before the IRS was ample to justify its conclusion that the taxpayers' valuable ownership interest in the Property had to be considered when evaluating their $10,000 offer in compromise, the IRS acted within its discretion in refusing to accept that offer. See Murphy, 469 F.3d at 33 (finding no abuse of discretion when IRS rejected offer in compromise after reasonably determining that taxpayers could afford more than compromise amount).

In this context, reviewing factual and legal determinations for reasonableness does not present an undue risk of an erroneous deprivation. The taxpayers will have the opportunity to challenge the substantive correctness of the IRS's ownership determination in subsequent judicial proceedings (say, by a motion to dissolve a wrongful attachment). By the same token, the trust — which was not a party to the proceeding before the IRS — will have an opportunity to assert its ownership of the Property and to litigate that question in an appropriate forum.[5]

We add a coda. Although this appeal presents a question involving the IRS's determination of a mixed question of fact and law, our analysis has broader implications. Whether an IRS

---

[5] Indeed, the trust already has brought an action to quiet title in the United States District Court for the District of Maine. See Me. Rev. Stat. tit. 14, §§ 6651-6662. That case has been stayed pending the adjudication of this appeal.

determination reached during the CDP process rests upon a purely factual question, a purely legal question, or a mixed question of fact and law, a reviewing court's mission is the same: to evaluate the reasonableness of the IRS's subsidiary determination. The CDP process presents no occasion for a reviewing court to demand incontrovertibly correct answers to subsidiary questions, whatever their nature. Rather, the IRS acts within its discretion as long as it makes a reasonable prediction of what the facts and/or the law will eventually show.[6]

### C. The Fee Award.

We need not linger long over the Commissioner's challenge to the imposition of attorneys' fees. The Tax Court made a fee award to the taxpayers as prevailing parties. See 26 U.S.C. § 7430(a). We have held that the IRS's rejection of the offer in compromise was unimpugnable. See supra Part IIB. Consequently, the taxpayers are not prevailing parties, and the award of attorneys' fees cannot stand.

## III. CONCLUSION

We need go no further. The IRS's nominee determination was reasonable and, therefore, should not be disturbed. It follows that the IRS's rejection of the $10,000 offer in compromise was not

---

[6] Of course, an absurd factual determination or a legal determination that flies in the face of settled precedent will never be reasonable and, thus, will always constitute an abuse of the IRS's discretion.

-21-

an abuse of discretion.  Accordingly, we reverse both the Tax Court's contrary ruling and its concomitant award of attorneys' fees.


**Reversed**.