# United States Court of Appeals
## For the First Circuit

---

No. 12-1625

BERKSHIRE BANK,

Plaintiff,

v.

TOWN OF LUDLOW, MA,

Defendant, Appellant,

DOUGLAS SHULMAN, Commissioner of Internal Revenue Service;
UNITED STATES OF AMERICA,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

---

Before

Boudin,[*] Selya and Stahl,
Circuit Judges.

---

[*] Judge Boudin heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion in this case. The remaining two panelists have issued the opinion pursuant to 28 U.S.C. § 46(d).

José A. Aguiar, with whom Doherty, Wallace, Pillsbury and Murphy, P.C. was on brief, for appellant.

Kenneth W. Rosenberg, Tax Division, United States Department of Justice, with whom Kathryn Keneally, Assistant Attorney General, and Thomas J. Clark, Tax Division, United States Department of Justice, were on brief, for appellees.

————————————

January 11, 2013

————————————

**STAHL**, **Circuit Judge**.  This appeal presents the question of whether a company that owned a particular parcel of land was the "nominee" of a delinquent taxpayer for purposes of a federal tax lien that attached to all of the taxpayer's property.  We conclude that it was and therefore affirm the district court's grant of summary judgment in favor of the United States.

William A. Livermore owned approximately fifteen acres of undeveloped land in Ludlow, Massachusetts.  In August 2005, the Town of Ludlow (Ludlow) approved Livermore's plan to divide the property into eleven lots and turn it into a development to be known as Leland Estates.  Ludlow imposed certain restrictions, contained in a recorded covenant that Livermore executed.  That same month, Livermore obtained a commitment from Berkshire Bank to make a loan to fund the development.  The commitment stipulated that the loan would be made to "William A. Livermore or nominee" and that, if Livermore assigned the commitment to a nominee, he would be required to guarantee the loan personally.

In September 2005, Livermore registered with the Commonwealth of Massachusetts a limited liability company (LLC) called WAL Development, LLC (WAL).  Livermore was the company's sole member, owner, resident agent, and manager, and WAL's business address was Livermore's home address.  Livermore formed WAL exclusively to develop Leland Estates.  In December 2005, he transferred title of the property to WAL by quitclaim deed,

receiving no consideration for the transfer.[1]  WAL established a line of credit with Berkshire Bank, secured by a mortgage on Leland Estates.  Livermore signed the mortgage deed and related documents in the name of the LLC, but he personally guaranteed repayment of the loan and made the mortgage payments from an account held in his own name at Berkshire Bank.

As parcels of the Leland Estates property were sold, Livermore deposited the proceeds into that same Berkshire Bank account.  He then transferred a portion of those proceeds into a separate account at Citizens Bank and used them to pay his personal expenses.  During tax years 2006, 2007, and 2008, Livermore incurred significant unpaid federal tax liabilities, arising in large part from the net income of WAL, which he reported on his individual tax returns.  In March 2009, the Internal Revenue Service (IRS) recorded a Notice of Federal Tax Lien[2] with regard to Livermore's 2006 and 2007 income tax liabilities.

Meanwhile, the Leland Estates development encountered financial difficulties, and the loan became delinquent.  Berkshire Bank foreclosed on the four unsold lots that remained and sold them

---

[1] Though Livermore received no consideration from WAL, he did obtain a $498,750 mortgage loan from Berkshire Bank when he transferred the land to WAL and used some of that loan to pay off a prior mortgage he had on the property.

[2] A federal tax lien attaches to "all property and rights to property, whether real or personal, belonging to" a taxpayer.  26 U.S.C. § 6321.

-4-

at auction.  The auction proceeds satisfied the outstanding balance on the mortgage, and $92,703.94 remained in surplus proceeds.  In August 2010, Berkshire Bank filed this interpleader action in the Massachusetts Probate and Family Court to determine who had the right to the surplus proceeds.

The bank joined Ludlow, Siok & Son Excavation (Siok), the Commissioner of the IRS, and WAL.  WAL made no claim to the surplus proceeds, and Siok stopped participating in the case once it was removed to federal court in October 2010.  Ludlow claimed an interest in the interpleader fund based on a $135,000 judgment that it had obtained against WAL in June 2010, resulting from WAL's failure to complete the Leland Estates development as it had promised to do in its 2005 covenant with Ludlow.  The United States, for its part, claimed an interest in the fund as a result of the assessments for Livermore's unpaid 2006, 2007, and 2008 federal income tax liabilities and the March 2009 notice of federal tax lien.  The claims of the United States and Ludlow each exceeded the amount of the surplus proceeds.

The United States moved for summary judgment, arguing that WAL was Livermore's nominee or alter ego.[3]  Ludlow conceded

---

[3] According to the IRS, "[a]s used in the federal tax lien context, a nominee is generally a third-party individual who holds legal title to property of a taxpayer while the taxpayer enjoys full use and benefit of that property."  I.R.M. 5.17.2.5.7.2(1). The alter ego theory, on the other hand, "focuses more on those facts associated with a 'piercing the corporate veil' analysis." William D. Elliot, Federal Tax Collections, Liens and Levies

-5-

that the federal tax lien had temporal priority over its judgment lien but responded that WAL was not Livermore's nominee or alter ego.  The district court granted the motion for summary judgment, finding that WAL was "manifestly" Livermore's nominee.  Berkshire Bank v. Town of Ludlow, No. 10-cv-30198, 2012 WL 1085568, at *2 (D. Mass. Mar. 29, 2012).

The United States advocated for, and the district court applied, a multi-factor test derived from federal law to determine nominee status.  See id.  On appeal, Ludlow does not take issue with the district court's use of that test but rather argues that the factors weigh in its favor enough to create a genuine dispute of material fact.  We pause to note, however, that "[w]hether a particular asset belongs to a taxpayer is a question of state law." Dalton v. Comm'r, 682 F.3d 149, 157 (1st Cir. 2012); see also Drye v. United States, 528 U.S. 49, 58 (1999) ("We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation."); Holman v. United States, 505 F.3d 1060, 1067-68 (10th Cir. 2007); Spotts v. United States, 429 F.3d 248, 251-53 (6th Cir. 2005); Scoville v. United States, 250 F.3d 1198, 1202 (8th Cir. 2001).

¶ 9.10[2] (2d ed. 2008).

Thus, in reviewing a collection due process determination by the IRS in <u>Dalton</u>, we held that Maine law provided "the substantive rules of decision" as to whether a trust was merely a nominee for the taxpayers. 682 F.3d at 157. Maine recognized something similar to the nominee doctrine, but state case law did not "fully delineate the contours of" that doctrine. <u>Id.</u> We found that the IRS had acted reasonably in applying case law from other jurisdictions -- primarily federal cases -- "to fill the void and illuminate Maine's nominee doctrine." <u>Id.</u>

In this case, however, the parties have not even mentioned the state law question on appeal, nor did the district court address it below. We will therefore assume, without deciding, that Livermore had an adequate interest in the Leland Estates property under Massachusetts law, because Ludlow has waived any claim to the contrary. See <u>Farris</u> v. <u>Shinseki</u>, 660 F.3d 557, 562 n.5 (1st Cir. 2011). We will also assume, again because Ludlow has not argued otherwise, that it was appropriate for the district court to apply the federal nominee test. See <u>id.</u>

Our standard of review merits one additional detour. In the typical summary judgment case, our review is de novo. See <u>Reich</u> v. <u>John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997). As Ludlow conceded at oral argument, however, this is a non-jury case in which "[t]here are no significant disagreements about [the] basic facts," and the parties have not sought to introduce

additional evidence or present witnesses. EEOC v. S.S. Clerks Union, Local 1066, 48 F.3d 594, 603 (1st Cir. 1995) (quoting Federacion de Empleados del Tribunal Gen. de Justicia v. Torres, 747 F.2d 35, 36 (1st Cir. 1984)) (first alteration in original). Instead, the parties' dispute centers around the inferences that the district court should have drawn from the facts at issue. In such a case, we can "assume that 'the parties considered the matter to have been submitted below as a case ready for decision on the merits.'" John Alden, 126 F.3d at 6 (quoting Federacion de Empleados, 747 F.2d at 36). Accordingly, we review the district court's factual inferences for clear error only, though the court's "ultimate application of the law to the facts . . . remains subject to de novo review." Id.

The district court considered the nominee factors articulated in In re Callahan, 442 B.R. 1 (D. Mass. 2010), which are as follows:

> [1] the lack of consideration paid by the titleholder; [2] a close relationship between the taxpayer and the titleholder; [3] the control exercised over the property by the taxpayer while title is held by another; [4] the use and enjoyment by the taxpayer of the property titled to another; [5] lack of interference in taxpayer's use of property by the titleholder; [6] the use of property or funds titled to another to pay the taxpayer's personal expenses;[4] [7] whether the taxpayer

---

[4] The district court seems to have conflated factors five and six. See Berkshire Bank, 2012 WL 1085568, at *2 (considering "the lack of interference in a taxpayer's personal expenses").

exercises dominion and control over the property, or treats it as if it belongs to him; [8] whether title was placed in the record owner's name as a result of or in anticipation of the taxpayer's liability.

Id. at 6 n.5; see also Dalton, 682 F.3d at 158 (listing a similar set of factors). "Virtually without exception, courts focus on the totality of the circumstances without regarding any single factor as the sine qua non of a nominee relationship." Dalton, 682 F.3d at 158.

We agree with the district court that those factors weigh in favor of finding that WAL was Livermore's nominee. See Berkshire Bank, 2012 WL 1085568, at *2. First, Livermore transferred the property to WAL for no consideration. Second, the relationship between Livermore and WAL was very close. No one else had any interest in the company, made decisions for the company, or benefitted from its income, and WAL operated out of Livermore's home. Third, Livermore exercised total control over the property and its development. Fourth, and relatedly, he also had complete use and enjoyment of the property, as evidenced by his formulation and execution of the plan to subdivide the property and sell off the lots. Fifth, WAL did not interfere with that use of the property. Sixth, Livermore admitted during his deposition that he used ten to fifteen percent of the revenue from WAL to pay his personal expenses. Seventh, Livermore treated the property as if it belonged to him. Eighth, he testified that he set up the LLC

and transferred title to the property solely to avoid legal liability "in case somebody got hurt on the property."[5]

There are certainly some countervailing considerations. The deed memorializing the transfer from Livermore to WAL was properly recorded. WAL had a lawyer and an accountant (who also rendered services to Livermore), filed annual reports with the Massachusetts Secretary of State, and kept records of its corporate transactions.[6] Livermore segregated those records from his personal ones, and his attorney maintained a corporate book. Livermore also used what the district court described as "a separate checking account" for WAL at Berkshire Bank, from which he made mortgage payments and paid property taxes and insurance premiums. Berkshire Bank, 2012 WL 1085568, at *2.

Importantly, however, the Berkshire Bank account was held in Livermore's name, not WAL's, and Livermore testified that he "frequently" (in other words, "[p]robably once a month")

---

[5] Ludlow seems to suggest on appeal that the taxpayer must have transferred the property to avoid tax liability specifically. Case law does not support that proposition. See, e.g., Dalton, 682 F.3d at 158 (describing the factor as "whether the property was transferred in anticipation of liability"); Holman, 505 F.3d at 1065 n.1 (describing the factor as "whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability"); Oxford Capital Corp. v. United States, 211 F.3d 280, 284 n.1 (5th Cir. 2000) (describing the factor as whether the property was "placed in the name of the nominee in anticipation of a suit or occurrence of liabilities").

[6] The district court's finding that WAL filed income tax returns with the IRS is not supported by the record.

-10-

transferred money from the account into his personal account at Citizens Bank. More specifically, as mentioned above, Livermore estimated that he moved about ten to fifteen percent of the money from the Berkshire Bank account into his Citizens Bank account to pay for personal expenses. There was never any truly separate account for WAL. That blurring of the lines between WAL and Livermore speaks to the closeness of their relationship and the degree to which, post-transfer, Livermore continued to treat the Leland Estates property as his own and fully benefit from it. See In re Callahan, 442 B.R. at 6 n.5; Dalton, 682 F.3d at 158.

The ultimate inquiry in a nominee case "is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership." Holman, 505 F.3d at 1065. In answering that question, the district court had to draw inferences about the relative significance or insignificance of the essentially undisputed facts. We discern no clear error in those inferences, nor any error in the court's ultimate conclusion that WAL was Livermore's nominee. See John Alden, 126 F.3d at 6. We do not wish to suggest, as Ludlow fears, that a single-member, single-purpose LLC can never escape nominee status for purposes of a federal tax lien. But under the circumstances presented here, there was simply too much intermingling of funds and too close of a relationship between Livermore and WAL for us to conclude that

-11-

WAL was anything other than "a legal fiction." <u>Holman</u>, 505 F.3d at 1065.

Like the district court, we take "very little pleasure in this ruling, which leaves Ludlow with an unfinished subdivision." <u>Berkshire Bank</u>, 2012 WL 1085568, at *3. However, the statutory language creating the federal tax lien "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." <u>United States</u> v. <u>Nat'l Bank of Commerce</u>, 472 U.S. 713, 719-20 (1985) (citation omitted). Accordingly, we <u>affirm</u>.